ALASKA STATE BANK, Appellant,

v.

GENERAL INSURANCE CO. OF
AMERICA, Appellees.

GENERAL INSURANCE CO. OF
AMERICA, Cross-Appellant,

v.

ALASKA STATE BANK, Cross-Appellee.

Nos. 2638, 2713.

Supreme Court of Alaska.

Feb. 10, 1978.

As Amended on Grant of Rehearing
June 16, 1978.

Herbert Berkowitz, Ely, Guess & Rudd, Anchorage, for appellant-cross-appellee.

John Anthony Smith, Anchorage, for appellee-cross-appellant.

OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, ERWIN and BURKE, JJ.

BURKE, Justice.

The dispute in this case centers on whether a bonding company's interest in earned progress payments qualifies as a security interest subject to the filing and priority provisions of the Alaska Uniform Commercial Code.[1]

The events leading to this controversy began when Gilman's Construction, Inc., formerly Gilman's Excavating, Inc., contracted with the State of Alaska to construct Project No. F–046–1(16) and LSF–046–1(4), commonly known as the Tok Cut-off Project. The contract was executed on September 18, 1970. Needing payment and performance bonds, Gilman's approached appellee General Insurance Company of America (hereinafter the bonding company). The bonding company agreed to write the necessary bonds and acquired collateral against possible losses by requiring Gilman's to execute an instrument entitled "General Agreement of Indemnity for Contractors." Among other things, this agreement, which was executed in July of 1970, assigned to the bonding company Gilman's right to monies earned under bonded contracts.

The agreement contained a provision for perfection by the bonding company, under the Uniform Commercial Code, of the alleged security interest granted to it by Gilman's.

[The parties] [a]gree that this agreement may at any time be completed and filed by [the bonding company] in such a manner that it will qualify as a financing statement under the applicable provisions of any statute of any state which has adopted the Uniform Commercial Code, and that [the bonding company] may add such schedules to this agreement, describing specific items of security covered hereunder as shall be necessary under such statutes.

The bonding company, however, chose not to file the agreement or any other document as a financing statement.[2] Subsequently, the bank, in financing Gilman's operations, acquired security for its loans by inducing Gilman's to execute on July 23, 1970 a security agreement assigning to the bank, *inter alia*, all of Gilman's contract rights. The bank attempted to perfect this security interest by filing a financing statement on August 5, 1970 with the Alaska Department of Administration, as required by the Uniform Commercial Code.

---

1. AS 45.05.

2. AS 45.05.734(a) provides:
   *When filing is required to perfect security interest; security interests to which filing provisions do not apply.* (a) A financing statement must be filed to perfect all security interests
   . . . . .

Gilman's commenced work on the Tok Cutoff job. On or about September 8, 1971, however, Gilman Watts, the principal of Gilman's, presented himself at the offices of the bonding company in Seattle and acknowledged that he could not complete his contract. Gilman's had at that time fully earned a progress payment of $169,895.00, but the money had not, as yet, been disbursed by the State. Thereafter, representatives of the bonding company attended a meeting in Anchorage with officers of the bank. The meeting resulted in the establishment of a trust account at the bank for use by the bonding company in connection with the Tok Cutoff job.

In mid-September the State was informed by telegram and letter from the bonding company and Gilman, respectively, that Gilman's was in default; had suspended work on the project; was unable to complete the contract with the State; and was unable to pay its laborers, materialmen and suppliers. The State was further informed that the bonding company was completing the project. Nine days later, on September 29, the State issued a check in the amount of $169,895.00 payable to the bonding company. The check was sent to the bank where it was deposited in the trust account without signature and collected. On October 11, 1971, a cashier's check in the amount of $169,895.00 was sent by the bank to the bonding company. When subsequent investigation revealed that the bonding company had failed to perfect its alleged security interest in the earned progress payment, the bank commenced this action.

The respective positions of the parties can be summarized as follows:

The bonding company argues that when a contractor defaults and a bonding company steps in to complete the job and pay laborers and materialmen, it is subrogated to the rights of the owner, the contractor, the laborers, and the materialmen. Since the owner could have used funds still in its hands to complete the job, there would have been no sums available for the contractor and, therefore, for the contractor's secured creditor who stands in the contractor's shoes. Under this view the bonding company has first rights to the progress payment, although it may have been fully earned by the contractor's prior performance.

The bank argues that progress payments are contract rights and that the bonding company's subrogation theory merely purports to impose on them a hidden lien. The bank urges that both it and the bonding company had the power to take advantage of Article 9 of the Uniform Commercial Code and perfect their respective security interests. Under this view, the bank had prior rights since it utilized the U.C.C. while the bonding company did not.

Judge Eben Lewis, in a Memorandum Decision handed down on February 10, 1975, accepted the bonding company's view. He utilized as his standard the "Fifth Circuit Doctrine" which holds that only when the bank's money can be shown to have gone into a project to earn an undisbursed progress payment does the bank have a superior equitable claim since it relieved the bonding company of a burden that it would otherwise have had to bear.

Judgment was entered for the bonding company on cross motions for summary judgment when Judge Lewis found that the bank had failed to establish that its money was traceable to the Tok Cutoff job.

The first major issue that confronts this court is whether the lower court erred in finding that the unperfected assignment by Gilman's to its bonding company, of earned progress payments, was a security interest governed by the Uniform Commercial Code, as adopted in Alaska.

The bank urges the court that this "classic dispute" between bank and bonding company should be resolved under the Uniform Commercial Code. It cites various cases [3] decided by this court in an attempt

---

**3.** *Morrow v. New Moon Homes, Inc.*, 548 P.2d 279 (Alaska 1976); *Adams v. Waddell*, 543 P.2d 215 (Alaska 1975); *Kupka v. Morey*, 541 P.2d 740 n. 3 (Alaska 1975); *McGalliard v. Liberty Leasing Co. of Alaska, Inc.*, 534 P.2d 528 (Alaska 1975); *Prince v. LeVan*, 486 P.2d 959 (Alaska 1971); *Rego v. Decker*, 482 P.2d 834 (Alaska 1971). Appellant's Brief at 9–10.

to buttress its argument that the adoption of the Uniform Commercial Code reflects a legislative judgment to apply U.C.C. principles even where the U.C.C. by its terms is not applicable.[4] Even though the U.C.C. does not specifically deal with the case at bar, the bank argues that the policy of the U.C.C. is to draw distinctions based on functional rather than formal lines. According to the bank, both it and the bonding company initially had an interest in a "contract right;" that is, "a right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper."[5] It should be noted that the Indemnity Agreement assigns to the bonding company:

4. AS 45.05.690 provides:
*Short Title.* Sections 690–794 of this chapter shall be known and may be cited as Uniform Commercial Code—Secured Transactions.
The Official Comment to U.C.C. § 9–101:1 (AS 45.05.690) provides in pertinent part:
This Article sets out a comprehensive scheme for the regulation of security interests in personal property and fixtures. It supersedes existing legislation dealing with such security devices as chattel mortgages, conditional sales, trust receipts, factor's liens and assignments of accounts receivable.

\*   \*   \*   \*   \*   \*

The aim of this Article is to provide a simple and unified structure within which the immense variety of present day secured financing transactions can go forward with less cost and with greater certainty.

\*   \*   \*   \*   \*   \*

The scheme of the Article is to make distinctions, where distinctions are necessary, along functional rather than formal lines. Anderson, *Uniform Commercial Code* Vol. IV pp. 1, 3 (2nd ed. 1971)

5. AS 45.05.700.

6. AS 45.05.692(a)(1) provides in pertinent part:
*Policy and Scope.* (a) Except as otherwise provided in § 694 of this chapter on multiple state transactions and in § 696 of this chapter on excluded transactions, §§ 690–794 of this chapter apply, as far as concerns personal property and fixtures in the jurisdiction of the state,
(1) to a transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, accounts, or contract rights; . . .

7. AS 45.05.020(37) provides in pertinent part:

Monies due or to become due Contractor on any Contract, including all monies earned or unearned which are unpaid at the time of notification by [the bonding company] to the Obligee of [the bonding company's] rights hereunder.

It follows, the bank stresses, that the bonding company has by assignment intended to enter a transaction[6] creating an interest in personal property that secures payment or performance of an obligation[7] subject to[8] the filing[9] and priority[10] provisions of the U.C.C. When this position is coupled with the fact that there is no mention of this type of agreement in the U.C.C. provisions excluding certain transactions,[11] the Bank proposes that the U.C.C. scheme is applica-

*General Definitions.* Subject to additional definitions contained in the subsequent articles of this chapter which are applicable to specific articles or sections, and unless the context otherwise requires, in this chapter,

(37) 'security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation.

8. AS 45.05.692(b) provides in pertinent part:
(b) Sections 690–794 of this chapter apply to security interests created by contract, including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract, and lease or consignment intended as security. Sections 690–794 of this chapter do not apply to statutory liens except as provided in § 750 of this chapter.

9. *See* note 2 *supra.*

10. AS 45.05.754(e)(1) provides in pertinent part:
*Priorities among conflicting security interests in the same collateral.*

(e) In all cases not governed by other rules stated in this section (including cases of purchase money security interests which do not qualify for the special priorities set forth in (c) and (d) of this section), priority between conflicting security interests in the same collateral shall be determined as follows:
(1) in the order of filing if both are perfected by filing, regardless of which security interest attached first under § 722(a) of this chapter and whether it attached before or after filing.

11. AS 45.05.696 provides:
*Transactions excluded.* Section 690–794 of this chapter do not apply

ble and that the lower court was in error. Yet the bank offers no direct case authority to support its position.

The bonding company counters that the equitable principle of subrogation should control and that the court properly found that a surety's right of subrogation is not a security interest governed by the U.C.C.

As one court has stated:

Our effort will be to see what subrogation means in the transaction before us, to see what extent Article 9 [of the U.C.C.] is devised to deal with such a transaction, and to apply relevant case law. Subrogation is an old term, rooted in equity, and semantically stemming from words meaning 'ask under'. Today we use the parallel phrase, 'stand in the shoes of'. The equitable principle is that when one, pursuant to obligation—not a volunteer, fulfills the duties of another, he is entitled to assert the rights of that other against third persons.[12]

In attempting to address the problem presented we find that the majority of American jurisdictions which have considered the question have accepted the theory of equitable subrogation as the rule in situations such as the one before us.

In *National Shawmut Bank of Boston v. New Amsterdam Casualty Co.*,[13] Anderson Bros., Inc., a general contractor, entered into three construction contracts with the United States Air Force for work at Otis Air Force Base in Massachusetts and Dow Air Force Base in Maine. As required by the Miller Act,[14] Anderson Bros., Inc. applied to a surety for payment and performance bonds. Contained in the application for the bonds was an assignment to the surety of "earned monies that may be due or become due under the contract." This assignment to the surety was not recorded under the U.C.C.[15] The contractor thereafter defaulted.

(1) to a security interest subject to any statute of the United States such as the Ship Mortgage Act, 1920, to the extent that the statute governs the rights of parties to and third parties affected by transactions in particular types of property; or

(2) to a landlord's lien;

(3) to a lien given by statute or other rule of law for services or materials except as provided in § 750 of this chapter on priority of the liens;

(4) to a transfer of a claim for wages, salary, or other compensation of an employee;

(5) to an equipment trust covering railway rolling stock;

(6) to a sale of accounts, contract rights, or chattel paper as part of a sale of the business out of which they arose, or an assignment of accounts, contract rights, or chattel paper which is for the purpose of collection only, or a transfer of a contract right to an assignee who is also to do the performance under the contract;

(7) to a transfer of an interest or claim in or under a policy of insurance;

(8) to a right represented by a judgment;

(9) to a right of setoff;

(10) except to the extent that provision is made for fixtures in § 756 of this chapter, to the creation or transfer of an interest in or lien on real estate, including a lease or rents under the interest;

(11) to a transfer in whole or in part of any of the following: a claim arising out of tort; a deposit, savings, passbook, or like account maintained with a bank, savings and loan

association, credit union, or like organization; or

(12) to a security interest created by or on behalf of the state or any of its political subdivisions (including but not limited to the unorganized borough or any city or borough of any class, whether home rule or not) or any service area, public enterprise, public corporation, agency or instrumentality of the state or of any of its political subdivisions.

**12.** *National Shawmut Bank of Boston v. New Amsterdam Casualty Co.*, 411 F.2d 843, 844 (1st Cir. 1969).

There is authority in Alaska for the proposition that:

A surety who completes a contract or satisfies the claims of laborers and materialmen has established a subrogation right to all . . progress payments, which are in the hands of the contractee.

*Reliance Insurance Co. v. Alaska State Housing Auth.*, 323 F.Supp. 1370 (1971). However, that case is distinguishable on the fact that it involved a straight assignment versus the applicability of the U.C.C. at issue here.

It should be noted that due to the interstate nature of a surety's business much of the case law finds its source in Federal court.

**13.** 411 F.2d at 843.

**14.** 40 U.S.C. § 270a *et seq.*

**15.** 411 F.2d at 844.

In holding that the surety was subrogated to the government's right to apply to the cost of completion the earned but unpaid progress payments in its hands at time of default the court allowed recovery of such payments although the bank had previously filed a financing statement.[16] The court based this result on several factors.

(1) The Code's definition of a security interest as "an interest in personal property or fixtures which secures payment or performance of an obligation . . . [and which] includes any interest of a buyer of accounts . . . or contract rights" does not seem to fit the construction contract surety. The essence of the "security" is the opportunity, on default, to finish the job and apply any available funds against its cost of completion. This was held not to fall within the purview of personal property.[17]

(2) The term surety does not fit into the definition of a buyer of contract rights. The right to finish a job "is not the kind of independently valuable asset that such synonyms as 'goods, documents, instruments, general intangibles [and] chattel paper' suggest."[18]

(3) Section 9–102(2) [AS 45.05.692(b)] requires security interests to be "created by contract." The real security was "not the assignment of accounts receivable—which could be, failing the completion of performance, set off by the government—but the eventual right to be in the shoes of the government upon job completion. This is not 'created by contract' but rather [results from it], inhering in a surety, quite independently of the expressed terms of the contract."[19]

(4) The drafters of the U.C.C. rejected a proposed § 9–312(7) to the Code which would have provided that "a security interest which secures an obligation to reimburse a surety * * * secondarily obligated to complete performance is subordinate to" the claim of a later lender with a perfected security interest.[20]

The view that the right of equitable subrogation is not a security interest for the purposes of Article 9 of the U.C.C. has been adopted by the Eighth Circuit Court of Appeals in *In Re Gleason Co.*[21] and by the United States Court of Claims in *Home Indemnity Company v. United States.*[22]

**16.** *Id.* at 844.

**17.** *Id.* at 845–46.

**18.** *Id.* at 846.

**19.** *Id.*

**20.** *Id.* at 846.

In addition, the court quoted the U.C.C. Editorial Board's Comments which we also find persuasive.

The Surety Companies' representatives convincingly took the position that subsection (7) as it stands is a complete reversal of the case law not only of the Supreme Court of the United States but also of the highest courts of most of the states. They cited *Prairie State National Bank v. United States*, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896); *Henningsen v. U. S. F. & G.*, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908); *United States v. Munsey Trust*, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947) at 240; 9 Am.Jur. 72, §§ 114, 115; 43 Am.Jur. 939, § 197 *et seq.*; 60 C.J. Subrogation § 87; Stearns Law of Suretyship, 5th Ed. (1951), Page 472; *Appeal of Lancaster County Natl.*

*Bk.*, 304 Pa. 437, 155 A. 859 (1931); and 127 A.L.R. 974, 976. . . .

Under the cited case law, the surety's rights come first as to the funds owing by the owner unless the surety has subordinated its right to the bank. Subsection (7) of the Code as written would reverse the situation and give the bank priority in all cases.

'Under existing case law, both the contractor and the bank are in a position to bargain with the surety which may or may not be willing to subordinate its claim. Under subsection (7) as written in the Code the surety company would have nothing to bargain about.' Uniform Laws Annotated, Uniform Commercial Code, Official Draft. Text and Comments, at 773, 777 (1952); Uniform Laws Annotated, Uniform Commercial Code, Changes in Text and Comments, at 25–26 (1953).

**21.** 452 F.2d 1219 (8th Cir. 1971).

**22.** 433 F.2d 764 (Ct.Cl.1970). The court here was asking whether the Illinois U.C.C. was intended to supersede the right of equitable subrogation.

The states of Kansas,[23] Kentucky,[24] Mississippi,[25] Pennsylvania,[26] New York[27] and Massachusetts[28] also adhere to this position.

▇▇▇▇ We note that one of the basic policies embodied in the Uniform Commercial Code is a desire to make the law of commercial transactions uniform throughout the various jurisdictions.[29] To that end we hold that a surety's right to earned progress payments does not qualify as an interest in personal property[30] subject to the filing provisions of the Alaska Uniform Commercial Code[31] since the surety has the right to complete the job it has bonded and apply any earned funds against its costs. This does not secure the payment or performance of an obligation as a "security interest" as that term is defined in AS 45.05.-020(37).[32] We note with approval the opinion of the court in *National Shawmut Bank* that a surety also does not fall into the definition of a buyer of contract rights[33] and that a surety's interest in completing a project is not sufficient to be a security interest "created by contract."[34]

The bonding company contended in the lower court that a letter executed by the President of the Bank constituted a waiver of the bank's right to any earned progress payment. Judge Lewis after hearing testimony on that issue found there had been no waiver. The second major issue presented in this case arises on a cross-appeal and concerns the failure of the lower court to award costs to the bonding company for expenses it incurred in litigating that waiver issue.

The bonding company's argument that the court abused its discretion in failing to award it its costs on the waiver issue is without merit.

In *DeWitt v. Liberty Leasing Company of Alaska*, 499 P.2d 599, 600–01 (Alaska 1972) we held:

Under AS 09.60.010 and Civil Rule 54(d), the prevailing party is entitled to costs, including an award for attorney's fees. The determination of which party prevailed is committed to the discretion of the trial court and is reviewable on appeal only for abuse. (footnotes omitted).

Our opinion in that case quoted *Buza v. Columbia Lumber Company*, 395 P.2d 511, 514 (Alaska 1964), where we discussed the meaning of the term "prevailing party:"

The dictionary states that '*Prevailing* applies esp. to that which is predominant,' and it has been established by case law that the prevailing party to a suit is the

---

23. *United States F. & G. Co. v. First State Bank of Salina*, 208 Kan. 738, 494 P.2d 1149 (1972).

24. *National Surety Corp. v. State National Bank of Frankfort*, 454 S.W.2d 354 (Ky.Ct.App. 1970) (dicta).

25. *Travelers Indemnity Co. v. Clark*, 254 So.2d 741 (Miss.1971).

26. *Jacobs v. Northeastern Corp.*, 416 Pa. 417, 206 A.2d 49 (1965).

27. *Aetna Casualty and Surety Co. v. Perrotta*, 62 Misc.2d 252, 308 N.Y.S.2d 613 (1970).

28. *Canter v. Schlager*, 358 Mass. 789, 267 N.E.2d 492 (1971).

29. AS 45.05.004(b)(3).

30. AS 45.05.020(37).

31. *See* note 1 *supra.*

32. *See National Shawmut Bank, supra* at 845–46.

33. *Id.* at 846.

34. *Id.*

As a secondary argument the bank claims that the bonding company's theory of equitable subrogation should be rejected because "equity will only intervene where there is no adequate remedy at law." The Massachusetts Supreme Judicial Court answered this argument in *Canter v. Schlager*, 358 Mass. 789, 267 N.E.2d 492, 494 (1971). In affirming its view that the U.C.C. was inapplicable to a surety's right to equitable subrogation, the court stressed

Section 1–103 [AS 45.05.006] of the Code provides in part

'Unless displaced by the particular provisions of this chapter, the principles of law and equity . . . shall supplement its provisions.' 'No provision of the Code purports to affect the fundamental equitable doctrine of subrogation.' (citation omitted).

We find the Massachusetts court's statement dispositive on this issue.

one who successfully prosecutes the action or successfully defends against it, prevailing on the *main issue*, even though not to the extent of the original contention. He is the one in whose favor the decision or verdict is rendered and the judgment entered. (footnotes omitted; emphasis added).

■ Applying the standard of *DeWitt*,[35] it can be seen that the bonding company is the "prevailing party," and an award of attorney's fees was appropriate. However, it does not follow that the superior court abused its discretion by declining to award attorney's fees on each of the contested issues comprising the litigation. The superior court ruled against the bonding company on the waiver question, and it is not "manifestly unreasonable"[36] that it should take that factor into consideration in determining what overall amount of attorney's fees and costs should be awarded to the prevailing party. Such an approach is consistent with the observation we made regarding denial of *costs* to a prevailing party in *Cooper v. Carlson*, 511 P.2d 1305 (Alaska 1973). There we said:

[W]e do not believe that this is an appropriate case to authorize a denial of all costs to the prevailing party. . . . [T]he trial court should determine whether particular items on the cost bill should be disallowed as unnecessary to the litigation, but should award proper items of costs.[37]

■ As a second argument the bonding company asserts that Judge Lewis was in error in awarding only $5,000 for its attorney's fees, refusing to calculate the amount of attorney's fees according to the schedule contained in Civil Rule 82(a)(1).[38] The bonding company urges that Civil Rule 82(a)(1), which provides for a schedule of attorney's fees when a money judgment is recovered, should have been applicable since the result in this case had the same practical effect as a money judgment in its favor. We find such argument unpersuasive. The

---

**35.** In *DeWitt*, we reaffirmed the balancing of recovery approach previously applied in *Nordin Construction Company v. City of Nome*, 489 P.2d 455, 474 (Alaska 1971):

A simple balancing of the recovery in favor ·of each party makes it clear that the [appellant] was the prevailing party in this lawsuit and should have been awarded costs.

Other factors have also been used in determining who the prevailing party is. At the trial of *Cooper v. Carlson*, 511 P.2d 1305 (Alaska 1973), neither party recovered money damages and the trial court refused to. grant attorney's fees. On appeal, this court found the "prevailing party" by considering "the central issues of the case and the trial court's resolution of them." *Id.* at 1307.

Even though [appellant] did not prevail on . . . [a particular] subsidiary issue, it is clear . . . that a party may be the 'prevailing party' if he is successful with regard to the 'main issues in the action.' " *Id.* at 1308.

**36.** In *Palfy v. Rice*, 473 P.2d 606, 613 (Alaska 1970), we stated:

An abuse of discretion is established where it appears that the trial court's determination as to attorney's fees was manifestly unreasonable. (footnote omitted).

The same standard was applied in *DeWitt v. Liberty Leasing Company of Alaska*, 499 P.2d 599, 601 n. 6 (Alaska 1972).

**37.** *Cooper v. Carlson*, 511 P.2d 1305, 1309 (Alaska 1973). *See DeWitt v. Liberty Leasing Company of Alaska, supra* at 602 n. 13.

**38.** Rule 82(a) states:

(a) *Allowance to Prevailing Party as Costs.*
(1) Unless the court, in its discretion, otherwise directs, the following schedule of attorney's fees will be adhered to in fixing such fees for the party recovering any money judgment therein, as part of the costs of the action allowed by law:

ATTORNEY'S FEES IN AVERAGE CASES

|  |  | Contested | Without Trial | Non-Contested |
|------|----------|-----------|-------|-----------|
| First | $2,000 | 25% | 20% | 15% |
| Next | $3,000 | 20% | 15% | 12.5% |
| Next | $5,000 | 15% | 12.5% | 10% |
| Over | $10,000 | 10% | 7.5% | 5% |

Should no recovery be had, attorney's fees for the prevailing party may be fixed by the court as a part of the costs of the action, in its discretion, in a reasonable amount.

(2) In actions where the money judgment is not an accurate criteria for determining the fee to be allowed to the prevailing side, the court shall award a fee commensurate with the amount and value of legal services rendered.

(3) The allowance of attorney's fees by the court in conformance with the foregoing schedule is not to be construed as fixing the fees between attorney and client.

only money judgment in favor of the bonding company was some $1,300 on its counterclaim. On the main issue, there was no such judgment; that is, the financial status quo of the bonding company was preserved. Thus, Judge Lewis correctly ruled that attorney's fees were to be awarded, under Rule 82(a)(1), "in a reasonable amount," rather than according to the schedule contained therein.

█ The determination of attorney's fees is committed to the discretion of the trial court and reviewable on appeal only for abuse.[39] That abuse, is present only where it appears the trial court's determination was manifestly unreasonable,[40] arbitrary[41] or designed for a purpose other than justly deserved compensation.[42] Our review of the record has led us to conclude that the trial judge properly considered those factors[43] which are salient to such a decision on attorney's fees. Therefore, we find there was no abuse of discretion in the court below.

AFFIRMED.

RABINOWITZ, Justice, with whom CONNOR, Justice, joins, concurring.

I agree with the court's holding that the bonding company's claim based upon equitable subrogation has priority over the claim of a secured creditor even where the secured creditor has filed under Article Nine of the Uniform Commercial Code, as adopted in Alaska, and the surety has not.[1]

However, the court's opinion formulates the issue before us as whether "the unperfected assignment by Gilman's to its bonding company of earned progress payments was a security interest governed by the Uniform Commercial Code, as adopted in Alaska."[2] I think some additional observations are appropriate. In my view it is necessary to distinguish between an equitable subrogation analysis of the issues at bar and an analysis which focuses upon the assignment of monies due or to become due under bonded contracts and upon the priority of such assignments where there has been no filing under Article Nine of the Uniform Commercial Code.

In *National Shawmut Bank of Boston v. New Amsterdam Casualty Co.*, 411 F.2d 843, (1st Cir. 1969), the contractor's application for payment and performance bonds contained an express assignment to the surety of "earned monies that may be due or become due under said contract."[3] On default, the surety completed the project. Suit was thereafter instituted by a secured party, the Bank, challenging the surety's right to earned but unpaid progress payments. The court held that the doctrine of subrogation had survived passage of Article Nine; therefore, no filing by the surety was necessary in order to protect its priority as against perfected security interests. However, the First Circuit did not address the question whether express assignments should be treated in a different manner than claims based upon subrogation.

**39.** *DeWitt v. Liberty Leasing Company of Alaska*, 499 P.2d 599, 601 (Alaska 1972).

**40.** *Palfy v. Rice*, 473 P.2d 606, 613 (Alaska 1970).

**41.** *See Preferred General Agency of Alaska, Inc. v. Raffetto*, 391 P.2d 951, 954 (Alaska 1964).

**42.** *Fairbanks Builders, Inc. v. Sandstrom Plumbing & Heating*, 555 P.2d 964, 966–67 (Alaska 1976).

**43.** *See Patrick v. Sedwick*, 413 P.2d 169, 179 (Alaska 1966); *Fairbanks Builders, supra* at 968.

**1.** *See* AS 45.05.690–794.

**2.** Majority Opinion at 1364. The bonding company obtained from Gilman's a "General Agreement of Indemnity for Contractors." Under this agreement Gilman's assigned to the bonding company Gilman's right to monies earned under bonded contracts. The indemnity agreement provided, in part, that Gilman's assigned to the bonding company:

> Monies due or to become due Contractor on any Contract, including all monies earned or unearned which are unpaid at the time of notification by [the bonding company] to the Obligee of [the bonding company's] rights hereunder.

**3.** *National Shawmut Bank of Boston v. New Amsterdam Cas. Co.*, 411 F.2d 843, 844 (1st Cir. 1969).

Commentators have criticized this failure to differentiate[4] and have suggested that case law illustrates two separate rules for sureties.[5] Although judicial decisions have recognized the difference between equitable subrogation and express assignment,[6] none of the decisions studied has addressed their potentially different treatments under Article Nine. In *Canter v. Schlager*, 358 Mass. 789, 267 N.E.2d 492 (1971), Justice Braucher articulated the assignment problem in the following manner:

> If the surety were claiming the balance due under the contract by virtue of the assignment to it in the contractor's bond application, it would be fairly arguable that it was claiming a 'security interest'

in a 'contract right.' . . . To perfect a security interest, a financing statement must be filed unless the case is within one of several exceptions. (citations omitted)[7]

Despite this recognition, the court in *Canter* did not deal with the problems created where the surety has obtained an express assignment.

The drafters of the Uniform Commercial Code rejected proposed § 9–312(7) which provided that "[a] security interest which secures an obligation to reimburse a surety . . . secondarily obligated to complete performance is subordinate to" a later lender that perfects its security interest.[8] The official comments show the drafters' con-

---

**4.** *See* Note, *National Shawmut Bank: Another Step Toward Confusion in Surety Law*, 64 Nw. U.L.Rev. 582 (1969).

**5.** One commentator characterizes these rules as follows:

> First, if the surety elects to take an express assignment from the contractor, the filing requirements of article 9 apply, as they do any other assignment. . . . Secondly, if an express assignment was not made to the surety, the surety will probably prevail under its rights of subrogation, which are not subject to the priority rules of article 9.

Clark, *Suretyship in the Uniform Commercial Code*, 46 Texas L.Rev. 453, 476 (1968).

**6.** *See, e. g., In re Gleason Co.*, 452 F.2d 1219, 1221–22 (8th Cir. 1971); *Jacobs v. Northeastern Corp.*, 416 Pa. 417, 206 A.2d 49, 54 n. 8, 55 (1965).

**7.** *Canter v. Schlager*, 358 Mass. 789, 267 N.E.2d 492, 494 (1971). Justice Braucher further stated:

> We do not pass on the question whether the assignment to the surety in this case was excepted as 'a transfer of a contract right to an assignee who is also to do the performance under the contract,' . . . § 9–104(f), or 'an assignment of accounts or contract rights which does not alone or in conjunction with other assignments to the same assignee transfer a significant part of the outstanding accounts or contract rights of the assignor . . .' . . . § 9–302(1)(e).

*Id.*

**8.** Uniform Laws Annotated, Uniform Commercial Code § 9–312(7) (1952).

Professors White and Summers note the pragmatic origins of that decision: "The issue of Article Nine coverage was fought out at the drafting stage, and the surety companies pre-

vailed in their efforts to remain outside the Article." J. White & R. Summers, Uniform Commercial Code § 22–5, at 771 (1972). Professor Gilmore observes: "[The sureties] protested immediately, violently and effectively: in the next draft the offending provision disappeared, without official explanation." G. Gilmore, Security Interests in Personal Property § 36.7, at 973 (1965). However, Gilmore argues that the deletion of § 9–312(7) merely meant that priorities between a surety's assignment and a bank's assignment must be resolved by reference to § 9–312(5) if Article Nine applies at all. *Id.* While acknowledging that the language of § 9–104(f) "might be read to exclude an assignment to a surety who will, on the contractor's default, become liable to perform or complete the contract," *id.* § 10.5 at 309, he insists:

> The transaction meant to be excluded was the total assignment of a contract under which the assignee is to take over performance and receive payment—not the situation where a *financing assignee* (who may be a surety company . . .) takes over performance of a defaulted contract because of liability under a bond or simply in order to protect its investment. (emphasis added)

*Id.* at 309–10.

> That the draftsmen had no intention of excluding the surety *assignment* is entirely clear from the fact the 1952 draft, which included the provision subordinating the surety's security interest to the bank's later interest taken for new value, also included, in the same language, § 9–104(f) of the final draft. (emphasis added)

*Id.* § 36.7, at 974.

Professor Gilmore's view of the interaction between assignments subject to § 9–312(5) and subrogation claims is summarized at note 10, *infra*.

cern with protecting the priority position of subrogation claims.[9]  If the drafters of the UCC intended to leave subrogation unaffected by Article Nine, it should make no difference whether there also exists an unfiled express assignment of the same funds. The surety should prevail in order to carry out the legislature's intent.  However, if the surety's claim is grounded solely upon an express assignment there is no reason why it should not be subject to the same perfection and priority requirements as other security interests.[10]

In the case at bar, the State of Alaska would have been entitled to apply the earned, undisbursed payments to completion of its project when Gilman's failed to perform fully—regardless of the Bank's perfected security interest.  The bonding company was placed in the position of the state once it had completed performance and had paid all those whom the contractor owed in connection with the job.  However, the surety is subrogated only to the extent of reimbursement or indemnification.  The Bank stipulated that the cost to the surety of completing the Tok Cut-off project was substantially greater than the contract proceeds.  The bonding company apparently incurred a deficit of approximately $700,000.  Accordingly, I agree that the bonding company should prevail as to the $169,895.00 of earned, undisbursed progress payments—whether or not a prior filing of the indemnity agreement would have been required in order for the bonding company to prevail against the Bank's security interest in the absence of a subrogation claim.

**9.**  Uniform Laws Annotated, Uniform Commercial Code, Changes in Text and Comments, at 25–26 (1953).

**10.**  Professor Gilmore, a principal drafter of Article Nine, has also suggested that the UCC may affect sureties' express assignments differently than their subrogation claims.  While arguing that Article Nine priority among assignments is governed by § 9–312(5), Gilmore recognizes that subrogation theory retains vitality:

No doubt a provision of the Code, like § 9–312(7) of the 1952 Draft, which dealt specifically with the issue, would properly be held to have superseded prior law and to

state an exclusive rule.  It is much less clear that a general provision like § 9–312(5) should be so taken. . . .  The surety has always had both the assignment string and the subrogation string to his bow; he may still have, despite § 9–312(5)(a).

. . .  When the bank, by first filing, has the § 9–312(5)(a) priority, subrogation may come in, as an overriding principle, to aid the surety.  (footnotes omitted)

Gilmore, Security Interests in Personal Property § 36.7, at 977–78 (1965).