**KENAI LUMBER COMPANY, INC., Appellant,**

**v.**

**Robert LeRESCHE, Commissioner of Dept. of Natural Resources of the State of Alaska; Geoffrey Haynes, Director of Division of Lands of Dept. of Natural Resources; Frederick H. Boness, Deputy Commissioner of Dept. of Natural Resources; and South-Central Timber Development, Inc., Appellees.**

**SOUTH–CENTRAL TIMBER DEVELOPMENT, INC., Cross-Appellant and Appellee,**

**v.**

**KENAI LUMBER COMPANY, INC., Cross-Appellee and Appellant.**

**Nos. 5733, 5755.**

Supreme Court of Alaska.

June 11, 1982.

Richard Helm and Mark L. Figura, Burr, Pease & Kurtz, Inc., Anchorage, for appellant.

Shelley J. Higgins, Asst. Atty. Gen., Anchorage and Wilson L. Condon, Atty. Gen., Juneau, for appellees.

Leroy DeVeaux and James N. Wanamaker, Wanamaker, DeVeaux & Crabtree, Anchorage, for cross-appellant, South-Central.

Before RABINOWITZ, C. J., and CONNOR, BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

MATTHEWS, Justice.

In this case we are asked to review the legality of a negotiated amendment to a long term timber sale contract between the State of Alaska and South-Central Timber Development, Inc. The amendment has been challenged by Kenai Lumber Company, Inc., which operates a currently under-utilized sawmill in Seward, and competes with South-Central in the purchase of timber. The basis for Kenai's claim is that the changes which the amendment makes are so significant that they amount to a circumvention of the competitive bidding process under which the original contract was let. The trial court on cross motions for summary judgment ruled that the amendment was lawful. We agree for the reasons expressed herein.

## I

The original timber sale contract, designated Icy Cape No. 1, was made on December 1, 1969 following advertisement for public bids pursuant to AS 38.05.120. South-Central was the only bidder at the auction and received the award at the minimum stumpage prices established by the state.[1]

The sale area consists of approximately 13,760 acres in a remote location on the coast of south-central Alaska adjacent to Icy Bay. The contract estimates that some 206,800,000 board feet of timber can be taken from this area.[2] The contract requires all timber within the boundaries of the sale area meeting certain minimum specifications to be cut. The contract is to expire 20 years from the date of execution unless extended by the state. It contains a provision concerning the primary manufacture of the timber cut as follows:

Timber cut under this contract shall not be transported for primary manufacture outside the State of Alaska without written approval of the state. Primary manufacture shall be as defined under Section 406.104 of the "Timber Sale Regulations" and as further defined in the Governor's Policy Statement for primary manufacture dated April 8, 1968, a copy of which is attached hereto and hereby made a part of this contract.[3]

1. The prices were $7.00 per 1,000 board feet (m.b.f.) for Sitka spruce saw logs and $2/m.b.f. for hemlock saw logs.

2. Of this amount approximately 106,200 m.b.f. were Sitka spruce saw logs and 100,600 m.b.f. were hemlock saw logs.

3. Section 406.104 of the Timber Sale Regulations in existence as of the date of execution of the contract provides:
 Primary Manufacture.
 The Director may require that primary manufacture of logs, cordwood, bolts, or other similar products be accomplished within the State of Alaska.
 The term primary manufacture means manufacture which is first in order of time or development. When used in relation to sawmilling, it means:
 (a) The breakdown process wherein logs have been reduced in size by a headsaw or gang saw to the extent that the residual cants, slabs, or planks can be processed by resaw equipment of the type customarily used in log processing plants, or
 (b) Manufacture of a product for use without further processing, such as structural timbers (subject to a firm showing of an order or orders for this form of product.)
 Primary manufacture, when used in reference to pulp ventures, means the breakdown process to a point where the wood fibers have been separated. Chips made from timber processing wastes shall be considered to have received primary manufacture. With respect to veneer or plywood production, it means the production of green veneer. Poles and piling, whether treated or untreated, when manufactured to American Standards Association specifications are considered to have received primary manufacture.
 The Governor's Policy Statement for primary manufacture, referred to in the contract, provides:
 Cants may be manufactured from all species for export and shall be considered to have received primary manufacture when sawed up to a maximum thickness of 12 inches and may be of any width. Timber cut thicker than 12 inches must be squared on four sides along their entire length with allowances for one-third of each dimension (thickness and width) allowed in wane.

The contract calls for reappraisal of the prices of the timber at the end of five years after the effective date of the contract and thereafter in three year intervals.[4] A section of the contract incorporates by reference the state timber sale regulations. Of interest here is section 155 of the regulations pertaining to amendments and modifications:

Amendments to and modifications of the contract may be made in writing and become a part of the contract upon mutual agreement of the director and the purchaser; provided that such amendment or modification does not materially affect or change the meaning or intent of the contract.[5]

From 1970 through 1978 South-Central cut timber from the sale, squared it in compliance with the primary manufacturing requirement at its mill on Jakolof Bay, several hundred miles from the sale area, and exported the squared timber, called "cants," to Japanese markets. During this period the contract was amended on six occasions. These amendments included two price changes under the reappraisal provision of the contract,[6] and one amendment allowing 3,200,000 board feet of spruce and hemlock to be exported as round logs, that is, logs not subjected to primary manufacture.

The 7th amendment, agreed to in January of 1979, is the amendment in question in this case. The most important change it makes is that it waives the primary manufacturing requirement. Another important change deletes from the sale area all lands at an elevation above 400 feet and substitutes additional acreage. The deleted lands contain approximately 40,000,000 board feet of timber. About 14,000,000 board feet may be cut from the added acreage. The amendment also changes the stumpage prices, increasing the price of spruce to $80.00/m.b.f. and of hemlock to $28.00/m.b.f. Other aspects of amendment No. 7 include a provision that South-Central must also take logs suitable only for the manufacture of wood pulp or pay a fine; a provision which on the whole increases the penalty imposed on South-Central for failing to remove trees meeting the contract specifications; a provision increasing the penalty for leaving high stumps; and a provision making the new state Forest Resources and Practices Act, AS 41.17.010.950, applicable to the sale immediately rather than one year following the amendment as would otherwise be the case. At the time of the amendment it was estimated that the total harvestable timber remaining was some 87,000,000 board feet.

Due to a change in the administration of the air pollution control laws it became apparent in 1978 that South-Central's Jakolof Bay mill could not continue to operate beyond June of 1979 without making extensive changes in the burner used to dispose of the slabs created by primary manufacture. These changes were judged by

---

Chips made from timber processing wastes shall be considered to have received primary manufacture and export will be permissive on action of the Commissioner. Timber processing wastes is hereby defined as all timber, mill residue, logging residue or other material not presently being utilized or in demand for higher-valued products.

With the advance approval of the Commissioner, limited quantities of all species, excluding spruce and hemlock, may be exported in the form of round logs for experimental purposes only, e.g. to introduce a new product to market. Round logs may not be exported as a marketable commodity.

The above statement is intended to clarify and/or define Section 406.104 of the "Timber Sale Regulations" and supersedes all previous policy statements and/or resolutions.

---

4. Apparently the intent of the contract was to allow two years for construction of the roads and loading facilities which would be needed before timber cutting and transportation could take place. A special provision of the contract required that a minimum of ten million board feet be cut and paid for by the end of the third year.

5. 11 A.A.C. 76.155.

6. The first, effective December 1, 1974 changed spruce saw logs to $16.25/m.b.f. and hemlock saw logs to $12.00/m.b.f. and the second effective December 1, 1977 changed the price for spruce saw logs to $25.00/m.b.f. and hemlock saw logs to $18.00/m.b.f.

South-Central to be economically unfeasible. South-Central therefore sought a waiver of the primary manufacture requirement from the state. The state granted the waiver, making the following findings:

## FINDINGS AND WAIVER OF PRIMARY MANUFACTURE

Based on a review of the experience since this sale was let in 1969, the following findings are made:

(1) Actually, only four jobs, those of sawyer, off-bearer (of slab), millwright and night watchman, are added by the primary manufacture milling operations.

(2) That the waiver of primary manufacture will provide economic incentive for the more intense utilization of additional timber and will create at least as many jobs in the woods as were created through the milling operation.

(3) That given the limited volume in this sale, it will not be economic to install chipping operations or pneumatic shiploading facilities. Also, there is no other economic method of salvaging the slab created by primary manufacture.

(4) The one known economic method of disposing of the slab is by burning in a wigwam burner.

(5) That since Icy Bay is an area of pristine air quality at present, it is doubtful that the required permit could be obtained (see the case of *National Asphalt Pavement Assoc. v. Train* [D.C. Cir.], 539 F.2d 775 (1976).

(6) That, rather than continue a practice which requires waste of commercially valuable sapwood (by slabbing) and also causes potential air quality deterioration (by burning), it is submitted that it may be preferable to permit round-log export.

(7) That the outer ring, or sapwood, of the log is the most commercially valuable portion because of close grain, freedom from knots and consistent color and grain.

(9)[7] That under present primary manufacture requirements, a sizable percentage of the valuable sapwood is cut, burned, and wasted.

(10) It is further found that there is a strong market for the valuable sapwood and because of that strong market there will be a higher utilization of the forest products from this sale if round log export is permitted.

(11) Also a higher price will be obtained for the state's timber resources if primary manufacture is waived.

(12) Also, there will be benefits to the long-term management of Alaska's forest lands resulting from higher utilization.

The justification for deleting those portions of the sale area lying above 400 feet and for making a partial substitution of adjacent low lands is also expressed in formal findings made by the state:

## REDUCTION OF SALE AREA FOR PROTECTION OF GOAT HABITAT

Based upon the representations of the Habitat Division of the Alaska Department of Fish & Game, the following findings are made:

(1) That at the time this Contract was let in 1969, there had been limited funds for studying the fish and game habitat protection. Accordingly, the area received less intensive study than might otherwise have been the case.

(2) That subsequent investigation has revealed that timber stands at certain elevations and along certain slopes are vital to the protection of the goat population at Icy Bay.

(3) That these designated slopes are necessary for providing a proper wintering habitat for the goat population of Icy Bay.

(4) That it will support the sound conservation of wildlife resources at Icy Bay if these needed habitat areas are deleted from the Timber Sale.

---

7. There is no finding numbered 8.

(5) That although the timber purchaser has made certain capital investments based on the volume of timber within the contracted sale area, the purchaser is willing to amend the sale area by deleting the area essential to goat habitat if the stumpage is amortized over the lower volume.

## II

Kenai's challenge to amendment No. 7 in this court is based solely on the ground that the amendment violates the rule that material modifications may not be made to a contract let under a competitive bidding statute. This sale was made pursuant to AS 38.05.120 which requires that timber sales larger than 500,000 board feet be made by competitive bidding.[8] We alluded to the rule relied on by Kenai in *McKinnon v. Alpetco Co.*, 633 P.2d 281, 287 (Alaska 1981):

> [G]enerally a government contract that was initially competitively bid cannot be materially amended because that is tantamount to forming a new contract, which should be accomplished by starting all over again with competitive bidding.

This rule has been judicially imposed in order to guard against circumvention of competitive bidding requirements. Competitive bidding itself is designed to ensure that government obtains the most favorable terms possible in its contracts, and to protect the public from the possibility of favoritism, fraud, and corruption on the part of public officials. *Libby v. City of Dillingham*, 612 P.2d 33, 42 (Alaska 1980) (plurality opinion); *id.* at 44 (Rabinowitz, C. J., concurring).

Under the terms of this contract, competitive bidding can only be effective to accomplish these purposes for the first five years of the contract. Thereafter, the price of the timber is to be determined by state appraisals. These appraisals are based on current market and cost conditions and are not indexed to the original bid price. Kenai has not challenged this aspect of the contract and we therefore assume it to be legal for the purposes of this case. Based on this assumption we believe that, with one exception which we will discuss later, the rule prohibiting material modifications of competitively bid contracts has no application to amendment No. 7. That rule could not operate to ensure that the state receive the best price possible because price under this contract is determined privately; nor could it prevent favoritism, fraud or corruption on the part of state officials for the same reason.[9]

The evidence in this case indicates that the primary manufacture requirement detracts from rather than adds to the value of the end product. Thus a prospective purchaser of state timber would be willing to pay a higher stumpage price if there were no such requirement. If, therefore, an amendment to the contract had been made eliminating primary processing within the initial five year period a persuasive argument could be made that the protections which are meant to be afforded by competitive bidding had been by-passed. However, once the initial period is over the competitively established price is no longer effective and the removal of the primary pro-

---

**8.** AS 38.05.120 provides in relevant part:
Timber and other materials shall be sold either by sealed bids or public auction, depending on which method is determined by the commissioner to be in the best interests of the state, to the highest qualified bidder as determined by the director.
The 500 m.b.f. exception is expressed in AS 38.05.115.

**9.** This does not mean that the state officials are entirely free to modify long term timber sale contracts after the first reappraisal date has passed. As we have previously noted, 11 A.A.C. 76.155 prohibits contract amendments

which "materially affect or change the meaning or intent of the contract." Kenai, however, did not brief in its opening brief the question whether amendment No. 7 violates this regulation and we therefore do not pass on this point. In its reply brief it made no more than a conclusory assertion that § 155 prohibits material modifications, with no analysis or citation of authority. Under these circumstances we consider this point to have been waived. *See Hitt v. J. B. Coghill, Inc.*, 641 P.2d 211, 213 n.4 (Alaska 1982); *State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 528 (Alaska 1980).

cessing requirement is merely another market condition to be taken into account during reappraisal.

Essentially the same observations can be made with respect to the economic aspects of the change removing from the sale lands above 400 feet and substituting adjacent low lands. Kenai contends, quite plausibly, that the costs of harvest are less and the product value is higher in the newly substituted acreage than in the lands deleted from the sale. If those changes had been made during the first five years of the contract a legitimate question whether competitive bidding had been improperly circumvented would be presented. As it is, however, those changes are now simply new conditions to be reflected in each reappraisal.

 The one aspect of amendment No. 7 to which the rule prohibiting material changes potentially applies is the physical addition of timber land in partial substitution for the deleted acreage. The additional land has never been subject to the competitive bidding process. However, for the following reasons, the rule does not prohibit this change.

 Not all amendments to competitively bid contracts are prohibited, only those regarded as material. The concept of materiality in this context has not been satisfactorily captured in a single phrase. One court has spoken of "an essential change of such magnitude as to be incompatible with the general scheme" of competitive bidding; [10] another has phrased the question to be whether the amendment "so varied from the original plan, was of such importance,

or so altered the essential identity or main purpose of the contract, that it constitutes a new undertaking." [11] These formulations simply recognize that the materiality concept prohibits those changes which tend to be subversive of the purposes of competitive bidding. In determining whether an amendment has this tendency, courts have found the following factors to be of importance:

(1) the legitimacy of the reasons for the change; [12]

(2) whether the reasons for the change were unforeseen at the time the contract was made; [13]

(3) the timing of the change; [14]

(4) whether the contract contains clauses authorizing modifications; [15]

(5) the extent of the change, relative to the original contract.[16]

Applying these factors to the substitution of timber lands in this case leads to the conclusion that the substitution was not material for purposes of the rule prohibiting material changes.

The reason for the change was that the Department of Fish and Game had discovered after the contract was awarded that the mountainside included in the sale area contained important winter habitat for mountain goats. The Department therefore requested that the sale be modified by deleting this area. Since this deletion would eliminate an area containing some 40,000,000 board feet which the state had contractually committed to South-Central, it was necessary in order to obtain the agreement of South-Central to provide substitute timberland.

**10.** *Morse v. City of Boston,* 253 Mass. 247, 148 N.E. 813, 815 (1925), *on later appeal,* 260 Mass. 255, 157 N.E. 523 (1927).

**11.** *Albert Elia Building Co., Inc. v. New York State Urban Development Corp.,* 54 A.D.2d 337, 388 N.Y.S.2d 462, 467 (1976).

**12.** *See Myers v. Wood,* 173 Mo.App. 564, 158 S.W. 909, 912 (1913).

**13.** *See Sekerez v. Lake County Board of Commissioners,* 345 N.E.2d 865, 868–69 (Ind.App. 1976); *Myers v. Wood,* 158 S.W. at 912.

**14.** *See Albert Elia Building Co., Inc. v. New York State Urban Development Corp.,* 388 N.Y. S.2d at 467.

**15.** *Myers v. Wood,* 158 S.W. at 913. However, a clause authorizing modifications may not be so broadly read as to negate the statutory requirement of competitive bidding. *Morse v. City of Boston,* 148 N.E. at 816.

**16.** *See Albert Elia Building Co., Inc. v. New York State Urban Development Corp.,* 388 N.Y. S.2d at 467.

This appears to be a legitimate rather than a pretextual reason for modifying the contract. It furthers the state's strong interest in maintaining or increasing existing population levels of game animals.[17] Nor was the importance of the deleted area as wildlife habitat appreciated when the original contract was made. There is nothing suspicious about the timing of the change since it was made more than nine years after the initial contract was entered into, and timber cutting had taken place under the contract for seven years with about 58% of the total estimated volume in the original sale having by then been cut.[18] While the contract does not specifically authorize replacing one timber area with another, the change here was relatively small, the substituted timber amounting to less than 7% of the total originally sold.

In a contract of this magnitude and duration it is to be expected that changes in circumstances will occur and that new perceptions concerning needed environmental protections will develop. A measure of flexibility is obviously required to be able to respond intelligently to the needs created by those changes. The substitution of timber here does not exceed permissible bounds.

### III

The court awarded attorney's fees to South-Central of $40,000.00. Kenai challenges this as unreasonable, and contends further that no attorney's fees should have been awarded since this case is within the public interest exception to the rule that the prevailing party is entitled to an award of partial attorney's fees.[19]

■ The determination of court awarded attorney's fees is committed to the discretion of the trial court and reviewable on appeal only for an abuse of discretion. Such an abuse is regarded as present only where the trial court's decision appears to be manifestly unreasonable or motivated by an inappropriate purpose. *Alaska State Bank v. General Insurance Co.*, 579 P.2d 1362, 1370 (Alaska 1978). South-Central's attorneys expended some 845.8 hours in the defense of this case and South-Central paid them $75,624.00. The only argument made by Kenai that the court's award of $40,-000.00 is unreasonable is that Kenai's actual attorney's fees were less than that sum. This, however, does not demonstrate that South-Central's attorneys' billings were unreasonable for opposing sides in a lawsuit do not necessarily have equal burdens. We therefore conclude that Kenai has not demonstrated that the court's award was manifestly unreasonable.

■ We have recognized that in cases involving issues of genuine public interest an unsuccessful plaintiff should not be burdened with payment of a part of his opponent's attorney's fees under Civil Rule 82. *Thomas v. Bailey*, 611 P.2d 536, 539 (Alaska 1980); *Horowitz v. Alaska Bar Association*, 609 P.2d 39, 42 (Alaska 1980); *Gilbert v. State*, 526 P.2d 1131, 1136 (Alaska 1974). This exception has been made because of a fear that "awarding fees in this type of controversy will deter citizens from litigating questions of general public concern for fear of incurring the expense of the other party's attorney's fees." *Id.* at 1136. *Accord, Anchorage v. McCabe*, 568 P.2d 986, 990 (Alaska 1977).

In *Anchorage v. McCabe*, we identified three criteria useful in identifying public interest litigation:

(1) Is the case designed to effectuate strong public policies?

(2) If the plaintiff succeeds will numerous people receive benefits from the lawsuit?

(3) Can only a private party have been expected to bring the suit?

---

17. *See Frank v. State*, 604 P.2d 1068, 1073 (Alaska 1979); *State v. Tanana Valley Sportsmen's Ass'n*, 583 P.2d 854, 859 n.18 (Alaska 1978).

18. *See* p. 218 *supra.*

19. Kenai argues that the public interest it has sought to vindicate lies in protecting the integrity of the competitive bidding process.

568 P.2d at 991. *Accord, Thomas v. Bailey,* 611 P.2d at 539 n.7. The foregoing can arguably be answered favorably to Kenai in this case. However, our cases establish what can be regarded as a fourth criterion which excludes this case from the public interest exception.

In *Weaver Bros., Inc. v. Alaska Transportation Commission,* 588 P.2d 819, 823 (Alaska 1978); *Lynden Transport, Inc. v. State,* 532 P.2d 700, 717 (Alaska 1975), and *Mobil Oil Corp. v. Local Boundary Commission,* 518 P.2d 92, 104 (Alaska 1974), we upheld attorney's fees awards against parties who had raised important questions of public interest but did not prevail. In *Mobil* we stated:

> Because the sums at stake in this controversy are large enough to prompt a suit without consideration of the public interest, the superior court could have concluded that the property owners were acting in their private interests and not in behalf of the public.

*Id.* at 104. In *Lynden* we quoted with approval the foregoing language, 532 P.2d at 717, and in *Weaver Bros.* we stated, citing *Lynden* and *Mobil Oil*:

> [I]t appears to us that the competitive advantage sought by appellant in this litigation takes the case outside of the notion of public interest litigation.

588 P.2d at 823. Based on these authorities what we have called the fourth criterion may be expressed as whether the litigant claiming public interest status would have had sufficient economic incentive to bring the lawsuit even if it involved only narrow issues lacking general importance. Such a litigant is less apt than a party lacking this incentive to be deterred from bringing a good faith claim by the prospect of an adverse award of attorney's fees.

On this record, since Kenai was a competitor of South-Central and was seeking a continuing source of timber to process in its mill, the court could have concluded that it had sufficient economic reasons to challenge the amendment regardless of the grounds for the challenge. Under these circumstances we decline to hold that the award of attorney's fees to South-Central was an abuse of discretion.

AFFIRMED.

RABINOWITZ, Chief Justice, dissenting.

I do not agree with the court's ruling that the state and South-Central were free to eliminate the primary manufacture requirement of their timber sale contract. In my view the court places its imprimatur upon precisely the kind of modification to a competitively bid contract that the judicially-imposed rule against material modifications is designed to prevent.

The Alaska legislature has decreed that an important state resource and asset, timber, is to be disposed of only by competitive bidding.[1] This legislative mandate and its underlying policies are rendered ineffectual if the state and South-Central may discard their competitively bid contract and substitute in its stead a significantly different agreement. On the record presented in this case I must conclude that the primary manufacture requirement was an important term of the timber sale contract and that waiver of that requirement wrought an impermissible material change in the contract. I so conclude for several reasons. First, the primary manufacture requirement was an express condition of the state's request for bids, and the state candidly admits that the requirement was "a significant part of the consideration for the State's agreement to sell timber to South-Central." Second, the administrative regulation authorizing a primary manufacture requirement in timber sale contracts[2] and the governor's policy statement urging primary manufacture,[3] both of which were incorporated into the contract between the state and South-Cen-

---

1. AS 38.05.115, .120.

2. *See* Section 406.104 of the timber sale regulations, 11 AAC 76.130, the full text of which is reproduced at note 3 of the court's opinion.

3. This policy statement, which provides in part that "[r]ound logs may not be exported as a marketable commodity," is set forth at note 3 of the court's opinion.

tral, were undoubtedly designed to further the strong state interest in not exporting jobs in the often depressed forest products industry;[4] this state policy is subverted by elimination of the primary manufacture requirement. Third, Kenai Lumber plausibly suggests that the timber sale might have attracted different bidders and bids had the primary manufacture requirement not been included in the state's request for bids,[5] and the court concedes that such a requirement affects the price that potential bidders are willing to pay for state-owned timber. In light of these factors I am unable to agree that the state and South-Central were at liberty to waive the primary manufacture requirement of their competitively bid contract.

I further disagree with the majority's conclusion that the question of the materiality of the primary manufacture requirement need not be reached because the original contract authorized renegotiation of its terms after five years and at regular intervals thereafter. If the statutory competitive bidding requirements are to have any continuing viability, the parties to a competitive bid contract may not circumvent the legislature's mandate by including in their contract a provision which authorizes any and all modifications.[6] I recognize that the parties to a long-term contract for the sale of state-owned timber must be afforded a fair degree of latitude to make good faith modifications to their agreement in order to account for inevitable fluctuations in the market for timber and to respond to a myriad of factors which may not have been foreseeable at the time the timber was placed on bid. It does not follow, however, that the parties must be afforded unfettered license to rewrite their agreement; the judicially-imposed rule proscribing material modifications limits the power to alter a competitively bid contract and, in my view, that limit was exceeded when the state and South-Central removed the primary manufacture requirement from their contract.

---

**4.** I note also that both California and Oregon prohibit the export of state-owned timber without primary manufacture. *See* Cal.Pub.Res. Code § 4650.1 (West Supp.1982); Or.Rev.Stat. § 526.805 (1979).

**5.** South-Central was the only bidder on the contract in question.

**6.** The court recognizes that "a clause authorizing modification may not be so broadly read as to negate the statutory requirement of competitive bidding" but in my view fails to apply this rule to the state's and South-Central's power to alter their competitively bid contract.