ALBERT ELIA BUILDING COMPANY, INC., Appellant, v NEW YORK STATE URBAN DEVELOPMENT CORPORATION et al., Respondents.

Fourth Department, November 12, 1976

---

*Duke, Yaeger & Schlopy (Peter Ruppar* of counsel), for appellant.

*Hodgson, Russ, Andrews, Woods & Goodyear (Stephen Kelly* of counsel), for New York State Urban Development Corporation and another, respondents.

*George M. Donohue* for Morton Abramowitz and another, respondents.

*Moot, Sprague, Marcy, Landy, Fernbach & Smythe (John J. Phelan* of counsel), for Pigott Construction International, Ltd., respondent.

CARDAMONE, J. Petitioner, Albert Elia Building Company, Inc., (Elia) a domestic corporation engaged in the general construction business, commenced an article 78 proceeding to challenge the granting of a change order issued to the Pigott Construction Company for the construction of a tunnel project at the Niagara Falls Convention Center as contrary to the competitive bidding statutes, requesting that the City of Niagara Falls and the New York State Urban Development Corporation be restrained from making payments to Pigott by reason of said illegal change order.

In 1971 respondent City of Niagara Falls (City) entered into a lease agreement with respondent New York State Urban Development Corporation (UDC) whereby the UDC was to construct a convention center in downtown Niagara Falls on behalf of the City of Niagara Falls. The convention center was to consist of approximately two acres of buildings located along the eastern side of Fourth Street. In March, 1971

respondent Pigott, was awarded the $16,864,000 contract for the general construction of the convention center.

In the fall of 1972 the City commenced plans for the development of the areas to the west of Fourth Street, between the convention center and Niagara Falls. Abraham Geller and Associates (Geller) was awarded the contract to design the new development and submitted a proposal which consisted of a large plaza in the area between Third Street and Fourth Street, modeled somewhat after Rockefeller Center Plaza in New York City. This original design envisioned a covered-overpass across Fourth Street connecting the plaza with the second floor of the convention center. City and UDC officials were concerned, however, over the esthetics of the covered-walkway and they engaged in numerous discussions concerning it. These discussions culminated in a decision on May 11, 1973 by the City Council to request the architects and UDC to eliminate the covered-overpass and, as an alternative method of connecting the convention center with the Rainbow Plaza, to build a tunnel under Fourth Street. Drawings for the tunnel, completed by May 25, 1973, involved construction of a retaining wall on the west side of Fourth Street and the construction of a tunnel underneath Fourth Street running from the west side easterly to a point six feet from the outer foundation wall of the convention center.

When plans for the tunnel project (Tunnel B) were completed by Geller, the tunnel and retaining wall were still part of the Rainbow Plaza Project. By the middle of June, however, a decision was made that the work on the tunnel and retaining wall should be broken out of the plaza project. It was further decided that Tunnel B would not emerge into an air lock in front of the glass entrance doors located in the western face of the convention center but, rather, the tunnel would lead into an escalator shaft which would emerge within the convention center itself. Additional plans for the linkup with Tunnel B, the excavation of the escalator shaft, and the excavation within the convention center were then drawn up by architects, Johnson and Burgee.

On July 16, 1973 the City Council met to determine how to proceed with the work on the tunnel. The City Council decided that rather than have a public bidding they would award the work to Pigott through the issuance of change orders. Two field orders were issued to Pigott that same day after the consent of the City Council was obtained. Field

Order 53 covered the work required to construct Tunnel B in accordance with the plans submitted by Geller and Field Order 52 covered both excavation for the escalator pit and breakthrough into the convention center, in accordance with the plans submitted by Johnson and Burgee. Four days later, Pigott submitted a price proposal for the Tunnel B construction in the amount of $428,100.

Petitioner commenced the instant article 78 proceeding by order to show cause why the Tunnel B construction should not be awarded to the lowest responsible bidder pursuant to the public bidding statutes. Petitioner challenged only that part of the tunnel construction covered by Field Order 53, i.e., the tunnel itself and the retaining wall under Fourth Street. Subsequently, respondents served an answer seeking that the petition be dismissed. After a hearing on the merits, Special Term dismissed the petition and granted judgment in favor of the respondents. From this determination, petitioner Elia appeals. The contested Tunnel B work was subsequently performed and completed by Pigott and apparently full payment was made to Pigott by the City, as agent for UDC.

Petitioner contends that the Tunnel B construction work is outside the scope of the convention center contract and that the City, as agent for the owner, has violated the provisions of section 103 of the General Municpal Law and that the owner (UDC) has violated the provisions of section 144 of the State Finance Law by awarding such construction work other than to the lowest responsible bidder after public advertisement as required by said statutes. Respondents contend that petitioner has failed to show the personal aggrievement required to maintain the instant proceeding. In the alternative, they urge that petitioner cannot maintain an article 78 proceeding when it has another avenue for review of the change order by way of a taxpayer's suit pursuant to section 51 of the General Municipal Law.

The competitive bidding statutes (General Municipal Law, § 103; State Finance Law, § 144) impose a mandatory duty upon public officials. Article 78 is the proper vehicle to compel officials to perform a mandatory duty imposed by statute (CPLR 7803, subd 1). The question presented is whether petitioner is a proper party to compel respondents to comply with these mandates. We observe, at the outset, that petitioner's failure to bring a taxpayer's action pursuant to section 51 of the General Municipal Law is not fatal. Since the owner of

the convention center is a State agency, an action under section 51 which applies only to municipal action, would not lie. As owner of the convention center, UDC was responsible for an exercised control over decisions to proceed by change order rather than separate contract. Special Term found that "a citizen and taxpayer has no right to bring before the court for review the acts of another department of government simply because he is one of many such citizens and taxpayers nor does the court find petitioner to have shown the personal aggrievement required to bring it within the exception to that rule." The Court of Appeals, however, departed from its holding in *St. Clair v Yonkers Raceway* (13 NY2d 72), relied upon at Special Term and held that a taxpayer has standing to challenge enactments of the State Legislature as contrary to the mandates of the State Constitution. Thus, standing is held to exist where a failure to accord it would in effect erect an impenetrable barrier to any judicial scrutiny of legislative action *(Boryszewski v Brydges,* 37 NY2d 361). Petitioner is seeking traditional mandamus relief in its attempt to have UDC comply with the applicable competitive bidding statutes. As a general rule, where a citizen, in common with all other citizens, is interested in having some act of a general public nature done, devolving as a duty upon a public body or officer refusing to perform it, the performance of such act may be compelled by a proceeding brought by such citizen against a body or officer. This is especially so where the matter involved is one of great public interest, and granting the relief requested would benefit the general public (24 Carmody-Wait 2d, NY Civ Prac, § 145.255). The office which the citizen performs is merely one of instituting a proceeding for the general benefit, the only interest necessary is that of the people at large *(People ex rel. Stephens v Halsey,* 37 NY 344; 24 Carmody-Wait 2d, NY Civ Prac, § 145.255). Any citizen may maintain a mandamus proceeding to compel a public officer to do his duty *(Matter of Cash v Bates,* 301 NY 258; *Matter of Andresen v Rice,* 277 NY 271; *Matter of McCabe v Voorhis,* 243 NY 401; *Matter of Yerry v Goodsell,* 4 AD2d 395, 403 affd 4 NY2d 999). Further, resort to a proceeding under article 78 may be had by a party who is the lowest bidder on a project, and who asserts that by illegal official action he has been denied the award of the contract *(Matter of Dictaphone Corp. v O'Leary,* 287 NY 491; *Matter of Cestone Bros. v Solowinski,* 276 App Div 970; see, also, *Matter of Warren Bros. Co. v Craner,* 30 AD2d 437; *Matter of Allen v Eberling,* 24 AD2d

594). Inasmuch as unsuccessful bidders have standing, it would be "illogical to deny standing to one who claims that the violation of the statute prevented him from entering any bid at all" *(Empire Elec. Contrs. Assn. v Fabber,* 71 Misc 2d 167, 170). Moreover, the preparation of specifications, advertising of bids and awarding contracts for a public project is a matter of acknowledged public interest which relieves the petitioner of the obligation to show that it is an aggrieved party or that it has any special interest *(Empire Elec. Contrs. Assn. v Fabber, supra; Matter of General Bldg. Contrs. v County of Oneida,* 54 Misc 2d 260; *Matter of McDonough v Board of Educ.,* 20 Misc 2d 98; see, also, *Matter of Policemen's Benevolent Assn. of Westchester County v Board of Trustees of Vil. of Croton-on-Hudson,* 21 AD2d 693, 694). Standing has been granted absent personal aggrievement where the matter is one of general public interest (8 Weinstein-Korn-Miller, NY Civ Prac, par 7802.01, n 2).

We turn next to the question of whether the change order was made in violation of the public bidding statutes. Section 144 of the State Finance Law imposes a duty upon the UDC as owner of the Convention Center and as a "corporate governmental agency of the state, constituting a political subdivision and public benefit corporation" (New York State Urban Development Corporation Act, § 4; L 1968, ch 174, § 1) to let contracts in excess of five thousand dollars only after competitive bidding has taken place. Section 103 of the General Municipal Law imposes a similar requirement upon municipalities. The salutary purpose underlying these public bidding statutes is the same, i.e., they are "designed as a safeguard against the extravagance or corruption of officials as well as against their collusion with vendors" *(Gerzof v Sweeney,* 22 NY2d 297, 304). The competitive bidding statutes, however, do not apply where the changes involved are merely incidental to the original contract (Ann 135 ALR 1265, 1274). The law recognizes the necessity for changes in public contracts as construction goes forward. Change orders may be issued without competitive bidding as to details and minor particulars. However, no important general change may be made which so varies from the original plan or is of such importance as to constitute a new undertaking (16 Opns St Compt, 265, 267; 1957 Atty Gen [Inf Opns] 108, 109). Thus, UDC could modify or change the work required under the general construction contract so long as such modification did

not "alter the essential identity or the main purpose of the contract" *(Del Balso Constr. Corp. v City of New York,* 278 NY 154, 160; *Trimpoli v State of New York,* 20 AD2d 933; see, also, *Kingsley v City of Brooklyn,* 78 NY 200).

Article 12.1.1 of the General Construction Contract authorizes UDC by change order, without invalidating the contract, to "order changes in the work within the general scope of the contract consisting of additions, deletions or other revisions". UDC's contractual power to modify by change order is not a grant of authority to make a different or new contract without complying with the competitive bidding statutes (see, *Cahn v Metz,* 115 App Div 516; 13 McQuillin, Municipal Corporations [3d ed], § 37.125). The test to be applied is whether the supplemental work ordered so varied from the original plan, was of such importance, or so altered the essential identity or main purpose of the contract, that it constitutes a new undertaking.

The nature and scope of the work included in the change order transmitted to Pigott is determinative of the question whether the Tunnel B work was merely incidental to the main contract or rather a new undertaking. The original contract awarded to Pigott covered the construction of the Niagara Falls Convention Center. Eighteen months later the Rainbow Plaza Project was accepted by the City for development of the area west of the convention center. The Tunnel B project developed six months later as an alternative to the covered-walkway submitted by Geller as part of the Rainbow Plaza design. Tunnel B, the retaining wall under Fourth Street and the escalator pit were taken out of the Rainbow Plaza project at that point and placed in a separate contract as an extra piece of work after the original plaza design was modified. The Tunnel B project, therefore, originated as a substitute for the covered-walkway envisioned in the plaza project, and not as an alternative to a structure contemplated by the convention center contract. For this reason, the Tunnel B Project cannot be considered a modification or alteration of the structure contemplated by the publicly bid main contract. It must be viewed as additional, supplemental work required as a result of the decision to construct the Rainbow Plaza project.

The record clearly establishes that Tunnel B is located wholly within the Convention Center facility itself, as it runs below Fourth Street directly under the canopy roof of the

center. However, two other projects which were publicly bid after the main contract was awarded are also within the bounds of the convention center. Therefore, the geographical location of the work cannot be considered a determinative factor here. The record amply supports the conclusion that Tunnel B so varied from the original plan and was of such importance that it constituted a totally new undertaking on the part of the public bodies involved. As such, the Tunnel B project, as described in Field Order Number 53, should have been let after competitive bidding to the lowest responsible bidder.

The testimony in the record also revealed the overriding concern of the public officials to insure the structural integrity of the convention facility, its completion on time, the advantage of having responsibility for the work in a single contractor and Pigott's familiarity with the convention facility. While these concerns are genuine and valid, they are more appropriately addressed to the selection of a responsible bidder and cannot serve to justify dispensing with mandated competitive bidding.

The requirement of competitive bidding in the letting of municipal contracts is uniformly construed as mandatory and jurisdictional and failure to abide by the statute renders a public works contract void and unenforceable *(Gerzof v Sweeney,* 16 NY2d 206; *Matter of McNutt Co. v Eckert,* 257 NY 100; 10 McQuillin, Municipal Corporations [3d ed], § 29.30). Where work is performed pursuant to such an illegal contract ordinarily no recovery may be had by the vendor either on the contract or in *quantum meruit,* even though the municipality has received the benefits of the performance *(S. T. Grand, Inc. v City of New York,* 32 NY2d 300; *Gerzof v Sweeney,* 22 NY2d 297; *Jered Contr. Corp. v New York City Tr. Auth.,* 22 NY2d 187). The municipality is permitted to recover from the vendor all amounts paid under the illegal contract *(S. T. Grand, Inc. v City of New York, supra,* p 305; *Gerzof v Sweeney,* 22 NY2d 297, 305, *supra).* The reason for this harsh rule, which effects a complete forfeiture of the vendor's interest, is to deter violations of the bidding statutes. The heavy impact of total forfeiture is a factor to be considered where that penalty is so disproportionate as to shock the conscience. In an appropriate case a different remedy may be fashioned which will uphold the underlying purpose of the bidding statutes without rendering a judgment of full forfeiture *(Gerzof v Sweeney, supra).*

In the instant case there was neither allegation nor proof of fraud, collusion or other wrongdoing on the part of the respondents (cf. *S. T. Grand, Inc. v City of New York, supra),* rather the change order was granted only after valid and appropriate factors were considered by respondents in deciding to negotiate solely with Pigott for the construction of Tunnel B. Further, Pigott believed itself bound by the main convention center contract to perform such additional work. While such evidence of good faith on the part of respondents does not legitimize the contract, it mitigates against imposing the harsh remedy of full forfeiture. We believe that a more appropriate remedy under these circumstances is to order Pigott to refund the difference between the contract price for work done under Field Order No. 53 and the price for which a bidding general contractor would have agreed to construct Tunnel B. This measure of damages, to be determined by expert testimony at a hearing, would refund to the City an amount representing the bargain it lost by negotiating solely with Pigott for the tunnel contract.

Finally, petitioner, having succeeded in this proceeding for the benefit of the City, is entitled to an allowance of counsel fees out of the fund created by its efforts *(Gerzof v Sweeney,* 22 NY2d 297, 308, *supra).*

Accordingly the order and judgment should be reversed and the matter remitted to Supreme Court, Niagara County, for further proceedings.

MOULE, J. P., SIMONS, MAHONEY and WITMER, JJ., concur.

Order and judgment unanimously reversed, with costs and matter remitted to Supreme Court, Niagara County, for further proceedings in accordance with opinion by CARDAMONE, J.