ALBION INDUSTRIAL CENTER, Appellant, v TOWN OF ALBION et al., Respondents.

Fourth Department, May 19, 1978

## APPEARANCES OF COUNSEL

*Fix, Spindelman, Turk & Himelein (John Schwartz* of counsel), for appellants.

*Church & Church (Nixon, Hargrave, Devans & Doyle,* by *David Lascell,* of counsel), for respondents.

## OPINION OF THE COURT

DILLON, J.

This is an action for money damages arising from an alleged breach by the defendants of a contract, entitled "Lease Agreement", entered into between the parties in August, 1974. The agreement provided that the plaintiff would erect a building upon its five-acre parcel of property in the Town of Albion, New York, and that the land and building would then be leased to the town for use as a town garage and offices under conditions described as a "net lease".[1] The term of the agreement was five years and the rental was fixed at $1,000 per month for the first six months and $3,875 per month for the remaining 54 months. The town was given the option to purchase the premises after the first day of the sixth month of the term but prior to the commencement of the seventh month thereof, for the sum of $141,200. It was further provided that if the town failed to exercise its option to purchase

---

1. Paragraph 3 of the agreement provides in part that: "this lease is a net lease and that the TENANT agrees to pay as additional rent, at its sole cost and expense, any sum or sums which shall or may hereafter become payable, including, but not limited to, taxes, utilities, heating, insurance, structural and/or non-structural repairs, maintenance, water and meter charges, snow removal, and any and all other charges, expenses or damages of any kind whatsoever, and the TENANT shall and will and hereby expressly agrees to pay any and all such costs and expenses when they become due and payable and the TENANT hereby relieves the LANDLORD from any liability for the payment of same." The terms of the lease also obligated the town to repair or rebuild the structure in the event of its damage or destruction by fire or other casualty.

prior to the seventh month of the demised term, the option would expire. No provision was made for renewal at the expiration of the original term.

After the execution of the lease, plaintiff retained an architect to design a building which would be suitable for the town's purposes, began preparation of the building site, and ordered and received various materials to be used in the construction. On December 31, 1974 the town clerk notified the plaintiff that the town did not intend to proceed under the terms of the agreement. After notice to the town that it regarded the lease agreement as breached, the plaintiff filed notices of claim with the town board and thereafter commenced this action for damages.

Special Term granted the town's motion to dismiss the complaint made pursuant to CPLR 3211 (subd [a], par 7), upon the ground that the agreement was made in violation of the competitive bidding statute (General Municipal Law, § 103). Upon reargument, the court again dismissed the complaint and plaintiff appeals from both orders.

Section 103 of the General Municipal Law provides, *inter alia,* that "all contracts for public work involving an expenditure of more than thirty-five hundred dollars and all purchase contracts involving an expenditure of more than fifteen hundred dollars, shall be awarded * * * to the lowest responsible bidder". In their respective briefs, the parties largely have ignored that portion of the statute relating to "contracts for public work" and, instead, have focused upon the question of whether the agreement is a "purchase contract" within the contemplation of the statute.

An agreement for the purchase by or rental to a municipality of real property is not subject to the bidding requirements of section 103 of the General Municipal Law *(Davies v Mayor etc. of City of N. Y.,* 83 NY 207). The State Comptroller consistently has opined that the term "purchase contracts" in section 103 of the General Municipal Law pertains to purchase of materials, supplies, equipment or apparatus and should be read as not relating to real property (19 Opns St Comp, 1963, pp 120, 280; 11 Opns St Comp, 1955, p 39).

If a political subdivision determines that it needs a particular property for a public use, any requirement that the property "can only be obtained through the forms prescribed by the [bidding] statutes" would necessarily mean that the property "cannot be obtained at all" for it "cannot become the

subject of a competitive offer, to be consummated by a written contract with the person making the most favorable offer" (*Harlem Gas-Light Co. v City of New York,* 33 NY 309, 330). Statutes which establish forms of procedure for public bodies "are only obligatory to the extent, and in cases to which they are by their terms applicable." (*Matter of Dugro,* 50 NY 513, 517.) Moreover, each parcel of land and each building has its unique character which distinguishes it from all others such that to impose upon the municipality the obligation to receive competitive bids on similar or comparable premises would be inappropriate and illogical (cf. 1A Antieau, Municipal Corporation Law, § 10.28). Thus, if the document under review may fairly be regarded as a lease of private property for public use, and nothing more, it would not fall within the proscription of section 103 of the General Municipal Law.

In asserting its position that the agreement is void for failing to adhere to the competitive bidding requirement, the defendant strays from that issue in relying upon *Marine Midland Trust Co. of Southern N. Y. v Village of Waverly* (42 Misc 2d 704, affd 21 AD2d 753) and an opinion of the State Comptroller (25 Opns St Comp, 1969, p 114), both of which related to purported leases which were in fact installment purchase agreements in violation of the Local Finance Law. The Comptroller's comment, however, is relevant here. "The municipality has several options available if it wishes the owner to construct * * * a structure on his land. The municipality can lease or purchase the land and have the building constructed thereon for the municipality. The construction contract, however, is a public works contract * * * and subject to competitive bidding (Gen Mun L § 103). * * * Secondly, the owner can privately construct the building on his land and lease it to the municipality. This arrangement must be a *true lease for a reasonable sum.*" (25 Opns St Comp, 1969, p 115; emphasis in original.)

The options recited by the Comptroller were available to the town in fulfilling its need for the construction of a garage and offices. It chose to have the plaintiff construct the building on plaintiff's land, and since the agreement has the obvious potential of serving as a device to circumvent the competitive bidding statute, it must be carefully examined. In that regard, it is not dispositive that the parties have labeled the document a "Lease Agreement". We must look to the substance of the agreement and the rights it confers and the obligations it

imposes "in order to determine the true nature of the transaction and the relationship of the parties" *(Feder v Caliguira,* 8 NY2d 400, 404; *Matter of New York World-Telegram Corp. v McGoldrick,* 298 NY 11, 18).

■ Additionally, in construing the document, we must be mindful of the strong policy considerations underlying the enactment of section 103 of the General Municipal Law. The purpose of requiring competitive bidding in the letting of contracts for the construction of public facilities "is to guard against favoritism, improvidence, extravagance, fraud and corruption." *(Jered Contr. Corp. v New York City Tr. Auth.,* 22 NY2d 187, 193.) It serves "to insure economy in the public administration, and honesty, fidelity and good morality in the administrative officers" *(Harlem Gas-Light Co. v City of New York,* 33 NY 309, 329, *supra;* see General Municipal Law, § 100-a). The public policy to promote economy and exclude favoritism is so strong that a public work contract let in violation of a competitive bidding statute is generally held to be void (see, e.g., *Jered Contr. Corp. v New York City Tr. Auth., supra).* That principle was clearly enunciated by Justice CARDAMONE, writing for a unanimous court in *Elia Bldg. Co. v New York State Urban Dev. Corp.* (54 AD2d 337). "The requirement of competitive bidding in the letting of municipal contracts is uniformly construed as mandatory and jurisdictional and failure to abide by the statute renders a public works contract void and unenforceable *(Gerzof v Sweeney,* 16 NY2d 206; *Matter of McNutt Co. v Eckert,* 257 NY 100; 10 McQuillin, Municipal Corporations [3d ed], § 29.30). Where work is performed pursuant to such an illegal contract ordinarily no recovery may be had by the vendor either on the contract or in *quantum meruit,* even though the municipality has received the benefits of the performance *(S. T. Grand, Inc. v City of New York,* 32 NY2d 300; *Gerzof v Sweeney,* 22 NY2d 297; *Jered Contr. Corp. v New York City Tr. Auth.,* 22 NY2d 187). * * * The reason for this harsh rule, which effects a complete forfeiture of the vendor's interest, is to deter violations of the bidding statutes." (54 AD2d 337, 344.)

■ The agreement here, though titled a lease, may only reasonably be construed as a contract for construction and purchase of a building to be used for a public purpose. That the purchase was to have been consummated during the seventh month of the term, after the town had made six monthly payments of $1,000 each, does not change the charac-

ter of the transaction. The nature of the option to purchase is such that its exercise by the town effectively would have been compelled.[2] That conclusion is premised upon a fair reading of the agreement. If the option was exercised, the town would acquire the land and building for a total payment of $147,200, which sum we may properly assume would have represented the fair value of the property including, at the very least, a reasonable profit to the plaintiff. The purchase of the premises would not have resulted in risk or expense to the town greater than that already assumed by the terms of the "net lease".

On the other hand, should the town have failed to exercise its option, its rental for the remaining four and one-half years would have been increased to $3,875 per month and its total rental payment would have amounted to $215,250 over the five-year term, at the end of which it would have neither ownership of the property nor the right to its continued occupancy. It is inconceivable that the parties intended such an absurd result for not only would the plaintiff then be the sole owner of the improved property after the short space of five years, but it would also have fully recovered the cost of the improvement, the profit on the construction and a very substantial return on its investment, all at the expense of the taxpayers of the town. Additionally, it is not unreasonable to assume that the need for a town garage and offices would persist at that time and that the town would be left to renew this "net lease" on the plaintiff's terms and conditions or, alternatively, to arrange for other facilities. Obviously, the parties were aware that none of these events would come to pass because the option to purchase would be exercised.

We conclude, therefore, that the agreement may not fairly be characterized as a "true lease"; that the transaction which was contemplated by the parties was one of construction and purchase, rather than one of rental; and that their clear intent, as reflected in the agreement, was to circumvent the mandate of section 103 of the General Municipal Law that "all contracts for public work * * * shall be awarded * * * to the lowest responsible bidder".

The judgment and orders should be affirmed.

MARSH, P. J., SIMONS, HANCOCK, JR., and DENMAN, JJ., concur.

---

2. For a discussion of the effect of compulsory and noncompulsory option to purchase provisions in leases to municipalities, see 2 Antieau, Municipal Corporation Law (§ 15.40).

Judgment and orders unanimously affirmed, with costs.