City of Kingston v Aslan Envtl. Servs., LLC (2020 NY Slip Op 00192)





City of Kingston v Aslan Envtl. Servs., LLC


2020 NY Slip Op 00192


Decided on January 9, 2020


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: January 9, 2020

528394

[*1]City of Kingston, Appellant,
v
Aslan Environmental Services, LLC, Respondent. (And Another Related Action.)

Calendar Date: October 7, 2019

Before: Garry, P.J., Lynch, Mulvey and Devine, JJ.; Pritzker, J., vouched in.


Cullen and Dykman LLP, Albany (Christopher E. Buckey of counsel), for appellant.
The Greenberg Law Firm, Purchase (Bill Greenberg of counsel), for respondent.



Devine, J.
Appeal from an order of the Supreme Court (Mott, J.), entered October 3, 2018 in Ulster County, which, among other things, granted defendant's motion for (1) summary judgment dismissing plaintiff's complaint, (2) summary judgment on its complaint and (3) summary judgment dismissing plaintiff's counterclaims.
Plaintiff operates a wastewater treatment facility (hereinafter WWTF) and requested proposals for sewage sludge drying and pelletizing at it (see General Municipal Law § 
120-w). Defendant responded with a proposal to dispose of the sludge by converting it into biosolid pellets that could be used as fertilizer. Plaintiff selected the proposal and, in 2004, entered into a 10-year agreement contemplating that defendant would, as is relevant here, install, operate and maintain sludge drying equipment and at least one turbine generator at the WWTF. The parties amended the agreement in 2005 to extend its duration to 15 years and modify the terms under which plaintiff could purchase the installed equipment and terminate the agreement. The pelletizer entered into operation in 2007 — signaling the operational phase from which the term of the agreement was measured — and broke down in 2015. Shortly before the necessary repairs were to be made in May 2016, plaintiff advised defendant that it viewed the agreement to be unenforceable and directed defendant to refrain from acting with regard to the equipment at the WWTF.
The parties' dueling lawsuits regarding their interactions were joined by order of Supreme Court. Plaintiff sought, among other things, declaratory relief and damages and counsel fees for what it deemed to be breaches of the contract by defendant.[FN1] Defendant asserted a claim for breach of contract, as well as for declaratory and injunctive relief, prompting plaintiff to assert counterclaims that the 2004 contract and 2005 amendments were void and unenforceable. Defendant thereafter moved for relief that included summary judgment granting its claims and dismissing those of plaintiff. Plaintiff cross-moved for, as is relevant here, summary judgment granting its claims and dismissing those of defendant. Supreme Court granted defendant's motion and denied plaintiff's cross motion, determining that the 2004 contract and 2005 amendments thereto were valid and that plaintiff had breached the contract in various respects. Plaintiff appeals.
We modify. The parties' contract, relating as it does to the processing, disposal or recovery of solid waste at the WWTF, is subject to the procurement provisions of General Municipal Law § 120-w (see General Municipal Law § 120-w [1] [b]; [2]). Those provisions require that "the competitive bidding requirements set forth in General Municipal Law §§ 101 and 103 or, alternatively, . . . the 'request for proposals' [hereinafter RFP] procedure set forth in" General Municipal Law § 120-w are followed prior to entering into such a contract (Matter of Trinity Transp. Corp. v Town of Brookhaven, 166 AD3d 887, 889 [2018]; see Matter of Ramapo Carting Corp. v Reisman, 192 AD2d 922, 923 [1993]). Inasmuch as the procedures are intended to benefit taxpayers rather than "corporate bidders," they are "construed and administered with sole reference to the public interest," with the failure to comply with them leading to severe consequences (Matter of Conduit & Found. Corp. v Metropolitan Transp. Auth., 66 NY2d 144, 148 [1985] [internal quotation marks and citation omitted]; see Chenango Contr., Inc. v Hughes Assoc., 128 AD3d 1150, 1151-1152 [2015]). The failure will render the challenged contract void, foreclose recovery by the vendor and entitle the municipality to recover any monies paid under it (see D'Angelo v Cole, 67 NY2d 65, 70 [1986]; S.T. Grand, Inc. v City of New York, 32 NY2d 300, 305 [1973]; Gerzof v Sweeney, 16 NY2d 206, 208-209 [1965]; Albert Elia Bldg. Co. v New York State Urban Dev. Corp., 54 AD2d 337, 344 [1976]; Prosper Contr. Corp. v Board of Educ. of City of N.Y., 43 AD2d 823, 823 [1974]).
As the party seeking to set aside the contract, it fell upon plaintiff "to demonstrate 'actual' impropriety, unfair dealing or some other violation of statutory requirements" in its award to defendant (Matter of Acme Bus Corp. v Board of Educ. of Roosevelt Union Free School Dist., 91 NY2d 51, 55 [1997], quoting Matter of Conduit & Found. Corp. v Metropolitan Transp. Auth., 66 NY2d at 149). Plaintiff argued that the 2004 agreement was void because, although it was reached following competitive bidding under General Municipal Law §§ 103 and
120-w, the bid specifications were improperly developed in consultation with defendant and designed to ensure that defendant would obtain the contract.[FN2] It is undisputed that the parties were in negotiations for defendant's services before the specifications were issued. The ensuing specifications may have tended to favor defendant, but that showing did not render them illegal "since a particular product, that is, one marketed by only one manufacturer, may be required in the public interest" (Gerzof v Sweeney, 16 NY2d at 211; see Matter of Construction Contrs. Assn. of Hudson Val. v Board of Trustees, Orange County Community Coll., 192 AD2d 265, 267 [1993]). Instead, the essential showing is that the specifications were drafted "to insure the award of the contract to" defendant without regard to the public interest (Gerzof v Sweeney, 16 NY2d at 211; see J.I. Case Co. v Town Bd. of Town of Vienna, 105 AD2d 1077, 1077 [1984]; Edenwald Contr. Co. v City of New York, 86 Misc 2d 711, 723-724 [1974], affd on op below 47 AD2d 610 [1975]).
The dissent infers from proof that defendant developed a "new and innovative system," in which biogas collected from the WWTF's digesters power a scaled-down pelletizer suitable for a smaller municipality such as plaintiff, that only one company employs indirect contact drying technology for its pelletizers. Nothing in the record confirms that speculation and, notably, plaintiff did not substantiate it through an affidavit by one with relevant industrial or scientific knowledge. In any event, regardless of the ubiquity of indirect contact drying technology, plaintiff provided nothing to contradict the proof that its use served the public interest because it was safer, more reliable and less likely to generate troublesome odors than other technologies.
In contrast, defendant produced an affidavit from plaintiff's then-mayor, who stated that the options for sludge treatment had been thoroughly investigated and that the type of equipment offered by defendant would further the public interest by stabilizing plaintiff's sludge disposal costs, providing an environmentally sensitive means for that disposal and decreasing odors emanating from the WWTF that might affect ongoing waterfront development. The then-mayor further averred that the bid documents were prepared by municipal employees and that the specifications included nothing of peculiar benefit to defendant.[FN3] Defendant's president, a mechanical engineer, confirmed that point and averred that "[n]early any sludge drying pelletizing system on the market" could have satisfied the bid specifications. Plaintiff accordingly failed to meet its burden of showing that the 2004 agreement was void, and defendant demonstrated its entitlement to summary judgment on claims relating to that agreement's validity (see Matter of Blueline Commuter, Inc. v Montgomery County, 126 AD3d 1161, 1163-1164 [2015]; compare J.I. Case Co. v Town Bd. of Town of Vienna, 105 AD2d at 1077).
As for the extension of that contract's term and other changes wrought by the 2005 amendments, the parties were free to agree to them so long as the requirements of General Municipal Law § 120-w were satisfied (see General Municipal Law § 120-w [4] [b]). We do not agree with defendant that those changes, and the extension of the contract's duration in particular, were "incidental to the original agreement, such that [plaintiff] was exempt from" the statutory requirement that they be put out to bid or be the subject of an RFP (Matter of Trinity Transp. Corp. v Town of Brookhaven, 166 AD3d at 890; see also 1977 Atty Gen [Inf Ops] 85).[FN4] Inasmuch as no attempt was made to satisfy the procurement provisions of General Municipal Law § 120-w with regard to the 2005 amendments, the amendments are void (see Matter of Trinity Transp. Corp. v Town of Brookhaven, 166 AD3d at 890). We cannot say that this case presents the exceedingly rare situation where either laches or equitable estoppel could be invoked to prevent plaintiff, a governmental entity, from attacking the validity of the 2005 amendments to which it had agreed (see Michael R. Gianatasio, PE, P.C. v City of New York, 159 AD3d 659, 659 [2018]; A.C. Transp. v Board of Educ. of City of N.Y., 253 AD2d 330, 339 [1999], lv denied 93 NY2d 808 [1999]). Thus, Supreme Court should have granted plaintiff's motion to the extent that it sought summary judgment on its counterclaim declaring the 2005 amendments to be void.
The record leaves no doubt that plaintiff breached the 2004 agreement — the terms of which, even in the absence of the 2005 amendments, were in effect at the relevant times — most notably by preventing defendant from repairing or maintaining its equipment from 2016 onward. Defendant was therefore entitled, as Supreme Court properly determined, to summary judgment on its breach of contract claims. Plaintiff's remaining contentions, including that Supreme Court erred in granting summary judgment dismissing its claims for breach of contract, have been examined and lack merit.
Garry, P.J., Mulvey and Pritzker, JJ., concur.
Lynch, J. (concurring in part and dissenting in part).
I respectfully dissent, in part. To begin, I agree with the majority that the 2005 amendments to the original agreement are void for failing to satisfy the procurement provisions of General Municipal Law § 120-w. For the same reason, it is my view that the original agreement is also illegal and void.
Statutes requiring competitive bidding for public contracts "evince a strong public policy of fostering honest competition in order to obtain the best work or supplies at the lowest possible price. In addition, the obvious purpose of such statutes is to guard against favoritism, improvidence, extravagance, fraud and corruption" (Jered Contr. Corp. v New York City Tr. Auth., 22 NY2d 187, 192-193 [1968]). Where a municipality "fix[es] or manipulate[s] [bid] specifications as to shut out competitive bidding or permit unfair advantage or favoritism," the resulting contract is illegal (Gerzof v Sweeney, 16 NY2d 206, 209 [1965] [internal quotation marks and citation omitted]). That said, the "competitive bidding statutes do not compel unfettered competition" (Matter of New York State Ch., Inc., Associated Gen. Contrs. of Am. v New York State Thruway Auth., 88 NY2d 56, 67 [1996]). For example, where there is a "clear showing that it is essential to the public interest," specifications may be drawn in a way that "tend to favor one manufacturer over another" (Gerzof v Sweeney, 16 NY2d at 211) or where "a particular product, that is, one marketed by only one manufacturer, may be required in the public interest," i.e., a sole source contract (id.). Generally, specifications for a public work project must be rationally related to the "two central purposes of New York's competitive bidding statutes, both falling under the rubric of promoting the public interest: (1) protection of the public fisc by obtaining the best work at the lowest possible price; and (2) prevention of favoritism, improvidence, fraud and corruption in the awarding of public contracts" (Matter of New York State Ch., Inc., Associated Gen. Contrs. of Am. v New York State Thruway Auth., 88 NY2d at 68).
In seeking to set aside the contract, it was plaintiff's burden, as the majority correctly states, "to demonstrate 'actual' impropriety, unfair dealing or some other violation of statutory requirements" in the contract award to defendant (Matter of Acme Bus Corp. v Board of Educ. of Roosevelt Union Free School Dist., 91 NY2d 51, 55 [1997]). To that end, plaintiff's submissions reveal that, after a six-month review period, defendant submitted a pre-bid "Formal Proposal" in August 2003 to install, operate and maintain a sludge drying and pelletizing system developed in partnership with Seghers Keppel Technology, Inc., a company in Belgium. That system utilized a "[c]omplete indirect drying" process where "the heating medium is not in contact with the sludge" in producing the pellets. As defendant's president explained in his affidavit, "When [he] became aware of Seghers' processes, Seghers' principal clients for such systems were large metropolitan users, including Baltimore, Chicago, and Toronto in North America. No such system, known generally as a 'dryer-pelletizer[,]' existed at that time that would accomplish the drying of sludge in an entity such as Kingston, whose sludge volume was a fraction of the volume dealt with by then existing Seghers dryer-pelletizers."[FN5] The proposal noted that defendant conducted numerous site visits and collected and analyzed operational data from plaintiff's facility. The proposal also specified pricing, including a one-time $25,000 installation fee, plus a monthly fee of $15,000. No duration for an agreement was specified.
The record reveals that, after the proposal was submitted, the parties engaged in contract negotiations. On December 9, 2003, a communication between defendant's principals stated that plaintiff's then-mayor asked defendant's representative "to sit with him to create a bid." In February 2004, plaintiff issued a document styled as a "BID," seeking proposals by March 10, 2004 for a "Sludge Drying & Pelletizing RFP," identifying plaintiff's purchasing agent as the contact person. Plaintiff produced an affidavit from the purchasing agent explaining that the then-mayor "gave [him] the technical specifications" included in the "Notice to Bid," which the purchasing agent understood were prepared by defendant.
General Municipal Law § 120-w (4) (e) specifies that a municipality may enter into a solid waste agreement, such as the one under review, by competitive public bidding pursuant to General Municipal Law §§ 101 and 103 or, alternatively, by a "request for proposals" procedure set forth in subdivision (3) (see Matter of Trinity Transp. Corp. v Town of Brookhaven, 166 AD3d 887, 889 [2018]). The "BID" here conflated the language of both the bid and proposal formats, referring to General Municipal Law § 103 while seeking proposals for a specific sewage disposal system. Moreover, the record shows that plaintiff failed to comply with the information and notice requirements set forth in General Municipal Law § 120-w (4) (e). Beyond these statutory discrepancies, the key concern is that the specifications essentially called for a system that mirrored defendant's pre-bid proposal. Of particular significance is the fact that the specifications required "indirect contact dryers" and expressly excluded "proposals containing direct contact dryers."
Defendant's March 10, 2004 response mirrored its pre-bid proposal to install a "Seghers sludge dryer and pelletizer," while proposing a $40,000 one-time consultation fee, a $17,000 monthly fee and a 10-year term commencing with the operation of the system. No other proposal was submitted. Defendant's proposal was accepted and the parties entered into a Biosolid Equipment and Management Agreement as of August 20, 2004, which included an increased monthly payment sum of $19,600.
In my view, this documented sequence of events demonstrates that the bid specifications for a "Sludge Drying and Pelletizing System Process Overview and Description" were actually provided by defendant and were designed to ensure that defendant would be awarded the contract, rendering the contract illegal. As in Gerzof v Sweeney (26 NY2d 206 [1965], supra), the record fails to establish why an indirect contact dryer system was "essential to the public interest" (id. at 212). Defendant was accorded an extensive opportunity in advance of the bid to study the facility, actually submitted a pre-bid, detailed proposal to install the Seghers' sludge drying system that was ultimately installed and engaged in extensive pre-bid contract negotiations. No other prospective bidder was accorded such an advantage. For that matter, other prospective bidders were only given three weeks to submit a proposal. It is of particular concern that the "BID" did not embrace other sludge disposal technologies, but was limited to a system that matched Seghers' system, which Seghers had previously provided only in large metropolitan areas. That acknowledged fact contradicts the self-serving affidavits of both the then-mayor and defendant's president that the specifications were prepared by municipal employees and that "any sludge drying pelletizing system on the market" could have fulfilled the "BID" requirements. Nor was any showing made that only the Seghers' system could address plaintiff's concerns in a viable manner, as would be necessary to award a sole source contract. To the contrary, the "BID" expressly excluded other sludge drying technologies so that such a comparison cannot be made on this record.
As for defendant's assertion that the contract was awarded as a professional service contract pursuant to General Municipal Law § 104-b and plaintiff's procurement policy, this is not supported by the record or the procurement policy. Section
103-6 (A) of that policy provides "that the solicitation of alternative proposals or quotations will not be in the best interest of [plaintiff]" to obtain "[p]rofessional services or services requiring a special or technical skill, training or expertise." Here, as discussed above, plaintiff utilized a procurement process seeking proposals.
In my view, as in Gerzof, "for all practical purposes, the competitive bidding required by the statute was effectively eliminated" (Gerzof v Sweeney, 16 NY2d at 211). Since this contract was illegal and void, plaintiff was entitled to an award of summary judgment on its counterclaim declaring the contract void.
ORDERED that the order is modified, on the law, without costs, by reversing so much thereof as denied plaintiff's motion for summary judgment on its second counterclaim with regard to the 2005 amendments and granted defendant's motion for summary judgment dismissing said counterclaim; plaintiff's motion granted and defendant's motion denied to the extent that the 2005 amendments are declared void and unenforceable; and, as so modified, affirmed.



Footnotes

Footnote 1: The claim for declaratory relief was dismissed by Supreme Court prior to the order at issue here.

Footnote 2: Plaintiff used what appear to be form bidding documents, employing the bidding procedures of General Municipal Law § 103 to invite responses to what it called an RFP. Plaintiff contended in its motion papers that this was done in accordance with General Municipal Law §§ 103 and 120-w, but now suggests that it used the separate RFP procedure created by General Municipal Law § 120-w (4) (e) and deviated from that procedure. Inasmuch as the latter claim was not advanced in plaintiff's motion papers, plaintiff cannot advance it now (see Cowsert v Macy's E., Inc., 79 AD3d 1319, 1320 [2010]).

Footnote 3: In saying this, the then-mayor contradicted plaintiff's purchasing agent, who averred that he thought that the specifications had been prepared by defendant when the then-mayor gave them to him to prepare the bid documents. The purchasing agent did not explain why he believed that and, in any event, he did not assert that the specifications were either drafted to ensure an award to defendant or were counter to the public interest.

Footnote 4: Defendant suggests that General Municipal Law § 104-b, which directs the development and use of internal procurement policies for contracts that are "not required to be made pursuant to competitive bidding requirements . . . [under any] general, special or local law," may be applicable to the 2004 contract and 2005 amendments thereto (General Municipal Law § 104-b [1]). Assuming without deciding that they are correct (see e.g. Matter of Omni Recycling of Westbury, Inc. v Town of Oyster Bay, 11 NY3d 868, 869 [2008]), the provisions of that statute are not needed to assess the validity of the 2004 contract and were not used in the leadup to the 2005 amendments.

Footnote 5: Reflecting the rather unique nature of Seghers' system, the parties received an excellence award in 2008 from the Department of Environmental Conservation for "develop[ing] a new and innovative system — the first of its kind in the world — for managing waste water treatment plant residuals." Seghers' own marketing material explains that a wastewater treatment plant serving the Antwerp Belgium region, with 500,000 inhabitants, "chose [Seghers'] unique sludge solution from amongst important international companies, each having [its] own sludge drying technology."