McCarthy Concrete, Inc. v Banton Constr. Co. (2022 NY Slip Op 02168)





McCarthy Concrete, Inc. v Banton Constr. Co.


2022 NY Slip Op 02168


Decided on March 31, 2022


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:March 31, 2022

532089
[*1]McCarthy Concrete, Incorporated, Respondent,
v
Banton Construction Company et al., Appellants.

Calendar Date:February 16, 2022

Before:Egan Jr., J.P., Aarons, Pritzker, Reynolds Fitzgerald and Ceresia, JJ.

Hinckley, Allen & Snyder LLP, Albany (Antonino M. Leone of counsel), for appellants.
Robinson & Cole LLP, New York City (Thomas J. Donlon of counsel), for respondent.



Pritzker, J.
Appeals (1) from an order of the Supreme Court (McNally Jr., J.), entered January 15, 2020 in Rensselaer County, upon a decision of the court in favor of plaintiff, (2) from the judgment entered thereon, and (3) from an order of said court, entered June 16, 2020 in Rensselaer County, which denied defendants' motion to reargue.
In relation to a construction project at the train station in Rensselaer County (hereinafter the project), Amtrak, as owner of the project, hired defendant Middlesex Corporation as general contractor, which in turn subcontracted for the services of defendant Banton Construction Company. In accordance with its obligations as provided for in the general contract, Middlesex procured a payment bond with defendant Travelers Casualty and Surety Company of America. Thereafter, Banton entered into a subcontractor agreement with plaintiff to furnish labor, materials and services relating to the project's concrete work. The subcontract expressly provided for 11 enumerated exclusions from the scope of its concrete work, including, as relevant here, "[c]oncrete [p]umping" and "[t]actile." The subcontract laid out compensation for plaintiff based upon the unit pricing of the actual quantity of concrete poured into the project, including the reinforcement bar (hereinafter rebar) to the project.
Plaintiff performed work on the project until the summer of 2015, when an "overall work suspension" by Amtrak caused Banton to demobilize plaintiff, estimating that the project would resume in the spring of 2016. After being unable to resolve two payment issues with Banton, plaintiff filed suit in Connecticut in accordance with the subcontract's relevant provisions. In August 2016, the parties entered into a settlement agreement, lien waiver and release wherein Banton agreed to pay a certain amount for outstanding claims and, in return, plaintiff would withdraw its lawsuit and resume work on the project. Plaintiff returned to the project to finish the remaining minor items, however, subsequent communications between plaintiff and Banton indicated plaintiff's belief that the settlement agreement did not resolve its claim for rebar and that it would not complete the remaining concrete work until after it received payment for the furnished material.
Thereafter, Banton indicated that Amtrak desired to make changes to the concrete work including, as relevant here, using a concrete pumping method and installing tactile warning strips, and requested that plaintiff provide proposals for the costs of said modifications. Plaintiff sent proposals for some of the modifications, but they were not agreeable to Banton, and plaintiff was concerned about going forward without reaching an agreement as to compensation that accounted for plaintiff's increased labor and risk. On September 23, 2016, Banton directed plaintiff to return to the project site and proceed with the remaining work, despite having not yet reached an agreement as to compensation. [*2]Banton stated that it was "willing to fund the alleged added costs for concrete pumping and added reinforcing, under a reservation of rights." Banton also stated that if plaintiff did not commence and continue work within three days, Banton would terminate plaintiff for default as well as seek costs. After plaintiff did not commence work, on September 27, 2016, Banton notified plaintiff that, because plaintiff breached the contract and did not proceed with the work, Banton was "forced to contract with another subcontractor to complete [plaintiff's] work."
In January 2018, plaintiff commenced this action asserting causes of action against Banton for, among other things, breach of contract for failure to pay plaintiff's retainage and for rebar and quantum meruit, and against Middlesex and Travelers for breach of a payment bond. Defendants answered, generally denying the allegations and asserting affirmative defenses, and Banton asserted a counterclaim for breach of contract. A nonjury trial was held and, ultimately, Supreme Court,[FN1] by order entered January 15, 2020, found in favor of plaintiff for its breach of contract claim but denied plaintiff's claim for quantum meruit, as well as Banton's counterclaim; however, the decision did not expressly address plaintiff's claim for breach of the payment bond. Defendants moved to reargue, which motion the court denied by order entered June 16, 2020. Thereafter, the court held a hearing to determine plaintiff's award of counsel fees and, in August 2020, judgment was entered. Defendants appeal from the January 15, 2020 and June 16, 2020 orders, as well as the judgment issued thereon.[FN2]
The fundamental question to be answered in this case is whether plaintiff or Banton breached the subcontract. To that end, defendants contend that Supreme Court erred in finding that plaintiff's nonperformance did not constitute a breach of the subcontract due to defendants' alteration of the scope of plaintiff's work and in finding that Banton breached said subcontract upon its termination of plaintiff. "When conducting [a] review of [a] nonjury trial verdict, [this Court] independently review[s] the probative weight of the evidence, together with the reasonable inferences that may be drawn therefrom, and grant[s] the judgment warranted by the record while according due deference to the trial court's factual findings and credibility determinations" (Kingsley Arms Inc. v Kirchhoff-Consigli Constr. Mgt., LLC, 173 AD3d 1506, 1507 [2019] [internal quotation marks and citation omitted]). "[A] cause of action for breach of contract requires that [the] plaintiff show the existence of a contract, the performance of its obligations under the contract, the failure of [the] defendant to perform its obligations and damages resulting from [the] defendant's breach" (GRJH, Inc. v 3680 Props., Inc., 179 AD3d 1177, 1178 [2020]). "It is well settled that a contractual agreement that is complete, clear and unambiguous on its face [*3]must be enforced according to the plain meaning of its terms" (EDW Drywall Constr., LLC v U.W. Marx, Inc., 189 AD3d 1720, 1722 [2020] [internal quotation marks and citation omitted]).
The subcontract between Banton and plaintiff provides that plaintiff "shall perform and provide all labor, materials, tools, equipment . . . and any other item necessary to complete the [w]ork described below for the [p]roject" and provides a list of tasks that are "excluded from the subcontract," including concrete pumping, winter conditions and tactile. With respect to changes and claims, the subcontract states that "[Banton] may, at any time, unilaterally or by agreement with [plaintiff], and without notice to the sureties, make changes in the [w]ork. Any unilateral order, or agreement under this [p]aragraph . . . shall be in writing, unless an emergency requires [plaintiff] to proceed without a written order. [Plaintiff] shall immediately perform the work as changed without delay" (emphasis added). The subcontract also provides that, "[f]or changes ordered by [Banton] independent of [Middlesex], [Amtrak] or the [c]ontract [d]ocuments, [plaintiff] shall be entitled to equitable adjustment of the [s]ubcontract [p]rice or [p]roject [s]chedule, or both to the extent that impact can be substantiated to [Banton's] satisfaction . . .. Pending resolution of any claim, dispute or other controversy, nothing shall excuse [plaintiff] from proceeding with prosecution of the [w]ork" (emphasis added).
Donald Terrenzi, an estimator and project manager employed by plaintiff, testified that he was one of the project managers for the project and that he had been tasked with communicating and negotiating with Banton regarding scheduling of work, as well as overseeing daily operations. He recalled that the project sought to extend the existing platform for the railroad such that the bid for the project consisted of different components of concrete work that were compiled into one unit price bid. Terrenzi asserted that, when determining the scope of work under the subcontract, Banton had communicated that plaintiff would be provided access to pour the concrete and that pumping was not to be used, which was relevant in determining the price of the subcontract. He also stated that there had been "a very detailed conversation" with Banton wherein it was communicated that tactile strips were not to be included in plaintiff's scope of work. Terrenzi averred that, had the exclusions been included in the scope of concrete work, it would have "dramatically" increased the bid price and, in his view, in order for Banton to modify the subcontract to include the formerly excluded items, Banton would have needed to submit a change order or renegotiate the bid price. Terrenzi testified that when Banton sought to make changes to the work in August 2016, including concrete pumping and placing tactile strips that were specifically excluded under the subcontract, he submitted proposed change [*4]orders to Banton in connection with the changed scope of concrete work. Terrenzi testified as to why these modifications would cost more for plaintiff to complete and he recalled communications with Banton regarding his propositions but they ended with Banton "wrongfully terminat[ing]" the subcontract and hiring another subcontractor to complete the concrete work. Notably, on cross-examination, Terrenzi conceded that he had not taken the subcontract provisions that permitted Banton to unilaterally make changes to the work into account when demanding that Banton execute the change orders before plaintiff would resume work on the project.
James Nenninger, Banton's project manager for the project, testified that, in August 2016, Banton sought to change the scope of the work of the subcontract, including changing the method of delivery for the concrete from pouring to pumping due to some time constraints on the project. Nenninger testified that plaintiff refused to return to work unless Banton provided change orders and payment for any change orders that were not approved. Nenninger stated that it is common for construction jobs to have work changes made during the project such that state regulations provide for "force account," which requires that the "contractor proceed[] with the work that is changed and subtract [its] time and material, and . . . seek fair reimbursement for those costs once the work is completed"; he averred that the excerpt from state regulations has been incorporated into the subcontract for the project. Nenninger confirmed that Banton had agreed to pay the price for the pumping equipment, but that it could not agree with plaintiff as to some tangential costs associated with the process. Nenninger also testified that Banton reserved its right to "pull th[e] money back" that was to be paid to plaintiff for the changed work if Banton did not get paid by Middlesex or Amtrak. Nenninger also testified that he wrote a letter advising plaintiff that if it did not "commence and continue" with the work by September 26, 2016, Banton would terminate plaintiff for default. Nenninger also testified that he wrote the September 27, 2016 letter to plaintiff informing it that, due to plaintiff's breach of contract, Banton had contracted with another contractor to complete plaintiff's work.
Ultimately, Supreme Court found that Banton's request to modify the concrete delivery method from pouring to pumping, in light of the express subcontract exclusion, was a material change to the scope of plaintiff's work under the agreement. Although we agree with the court that this was a material change, we do not find it to be a cardinal change such that Banton can be found to have breached the contract (see 33 New York Practice, Construction Law Manual § 6:4 [2d ed 2021 update]). A cardinal change is one that affects "'the essential identity or main purpose of the contract,' such that it 'constitutes a new undertaking'" (Matter of Tutor Perini [*5]Corp. v City of N.Y. Off. of Admin. Trials & Hearings Contract Dispute Resolution Bd., 193 AD3d 665, 666 [2021], lv denied ___ NY3d ___ [Mar. 22, 2022], quoting Albert Elia Bldg. Co. v New York State Urban Dev. Corp., 54 AD2d 337, 343 [1976]). The main purpose of this subcontract was to complete the concrete work for the project, and we do not find that the changes in the work requested by Banton fundamentally changed this purpose so as to constitute a cardinal change that would relieve plaintiff of its obligation to perform under the subcontract (see Five Star Elec. Corp. v Trustees of Columbia Univ., 189 AD3d 536, 537 [2020]). This conclusion is further supported by the fact that plaintiff was ready, willing and able to implement these changes and continue to perform under the subcontract, but only if its price was met.
That said, we also do not agree with Supreme Court that plaintiff's performance under the subcontract was excused because there was no promise from Banton to compensate plaintiff for the changed work. Banton established that it had agreed not only to pay for the costs of the equipment needed to pump the concrete, but also agreed to pay some increased costs to plaintiff for the concrete pumping.[FN3] Indeed, Banton's agreement to pay plaintiff for the changed work went above what Banton was required to do by way of the subcontract, wherein plaintiff agreed that "nothing shall excuse [plaintiff] from proceeding" with the work.[FN4] The subcontract also specifically detailed the process to be followed by plaintiff to seek renumeration for increased costs due to changed work, and, if not satisfied, nothing would preclude plaintiff from commencing suit to seek damages. Further, it is clear from the subcontract that time was of the essence. Plaintiff's refusal to perform the changed work without an express agreement as to increased costs had the effect of holding Banton hostage in that the work,[FN5] which was part of a much larger project, was stalled. Given that plaintiff had agreed, pursuant to the subcontract, to continue the work while pursing dispute resolution, its failure to perform the work amounted to a breach of the subcontract. Thus, we disagree with Supreme Court that Banton breached the contract based upon terminating the subcontract when plaintiff refused to perform absent an express agreement as to costs for the increased work. Accordingly, we reverse Supreme Court's determination that Banton breached the subcontract and wrongfully terminated plaintiff and vacate the judgment as to any damages and counsel fees awarded to plaintiff based upon that breach. Rather, we find that plaintiff breached the subcontract by refusing to perform the work as it was required to do under the subcontract and, as such, grant Banton's counterclaim for breach of contract.
In light of our determination that plaintiff breached the subcontract, we now turn to Banton's claim that it is entitled to offset costs incurred to complete plaintiff's [*6]work. It is well settled that a contractor who terminates a subcontractor is entitled to deduct all costs to cure the breach if the contract so provides, as it does here (see e.g. Triple M. Roofing Corp. v Greater Jericho Corp., 43 AD2d 594, 594 [1973]). Article 8 of the subcontract gives such right to Banton, which now asserts that it is owed $106,068.15 for project completion (which is the cost it incurred to complete the concrete work less the amount it would have been had plaintiff completed the work pursuant to the subcontract), minus the amount owed for retainage to McCarthy in the sum of $44,081.93, for a total offset claim of $61,986.22. At trial, Nenninger testified in specific detail regarding the costs to complete the work remaining to be done under the subcontract, which included doing some of the work itself and working with two different subcontractors. Banton admitted into evidence documents substantiating these costs that were incurred to complete the work that plaintiff was supposed to perform under the subcontract. As such, Banton sufficiently established the amount due pursuant to the contract as a result of terminating plaintiff after its breach of the subcontract (see generally Davis v Mutual of Omaha Ins. Co., 167 AD2d 714, 715 [1990]).
We also find that Supreme Court erred by awarding plaintiff $20,000 in damages for rebar that was left at the project prior to the summer of 2015 work suspension, as payment for the rebar was incorporated in the August 2016 settlement agreement. "It is well settled that releases are contracts that, unless their language is ambiguous, must be interpreted to give effect to the intent of the parties as indicated by the language employed and that releases bar suits on causes of action arising on or prior to the date of their execution" (Rubycz-Boyar v Mondragon, 15 AD3d 811, 812 [2005], lv denied 5 NY3d 703 [2005] [internal quotation marks, brackets, ellipsis and citations omitted]). Here, the August 2016 settlement agreement provides that plaintiff "release[s] and forever discharge[s] Banton . . . from any and all claims known or unknown, asserted or unasserted against [Banton], which [plaintiff] ever had, now has, or which [plaintiff] . . . can, shall, or may have for the [w]ork performed by [plaintiff] on the [p]roject" pursuant to the subcontract, excluding claims for retainage, which is not relevant here. Further, signing the release, plaintiff acknowledged that, at the time of the release and settlement agreement, it had been paid in full for "all work, labor, services, equipment and materials furnished on the [p]roject by [it]." The record establishes that the rebar for which plaintiff seeks payment was supplied prior to the execution of the settlement; thus, we cannot reach any conclusion other than that payment for the rebar left at the project site at the time of the summer of 2015 work suspension was contemplated by the release and settlement agreement.
In light of the foregoing[*7], we need not reach defendants' remaining contentions.
Egan Jr., J.P., Aarons, Reynolds Fitzgerald and Ceresia, JJ., concur.
ORDERED that the appeals from the orders are dismissed, without costs.
ORDERED that the judgment is reversed, on the law, with costs, counterclaim of defendant Banton Construction Company granted and said defendant awarded damages in the amount of $61,986.22, with interest.



Footnotes

Footnote 1: Following the submission of proposed findings of fact and conclusions of law, the justice who had presided over the nonjury trial died. The parties agreed to have the newly assigned justice render a decision upon the record rather than retry the case.

Footnote 2: Defendants' appeal from the January 15, 2020 order must be dismissed as untimely (see CPLR 5513 [a]). Nevertheless, the final judgment brings the January 15, 2020 order up for review (see CPLR 5501 [a] [1]). Moreover, the appeal from the June 16, 2020 order must also be dismissed as no appeal lies from the denial of a motion to reargue (see Matter of Piacente v DiNapoli, 198 AD3d 1026, 1027 [2021]).

Footnote 3: Although Banton reserved its rights to seek reimbursement of these payments in the event that it was not compensated for them by Middlesex or Amtrak, this did not amount to an unlawful "pay-when-paid" arrangement (West-Fair Elect. Constrs. v Aetna Cas. & Sur. Co., 87 NY2d 148, 158 [1995]).

Footnote 4: We are unpersuaded by plaintiff's argument that it had the right to an agreement as to price before performing changed work because that clause was contained in the contract between Banton and Middlesex. Although the subcontract included some language incorporating Banton's contract with Middlesex, a general incorporation provision such as this, absent express language, incorporates only the provisions of the upstream contracts as to the "scope, quality, character and manner of the work to be performed by the subcontractor" (Bussanich v 310 E. 55th St. Tenants, 282 AD2d 243, 244 [2001]; see Matter of Wonder Works Constr. Corp. v R.C. Dolner, Inc., 73 AD3d 511, 513 [2010]; see generally 4G NY Prac, Commercial Litigation in New York State Courts, § 149.13 [5th ed 2021]). Moreover, the subcontract specifically states that, "[i]n case of a conflict between this [subcontract] and the [c]ontract [d]ocuments as incorporated herein, the terms of this [subcontract] shall prevail."

Footnote 5: Indeed, pursuant to the subcontract between Middlesex and Banton, certain delays could result in Banton being required to pay liquidated damages up to $7,300 per day.